[No. G020621. Fourth Dist., Div. Three. Dec. 18, 2000.]

SHAWN CHOATE et al., Plaintiffs and Appellants, v.
COUNTY OF ORANGE et al., Defendants and Respondents.

## COUNSEL

Thomas E. Beck for Plaintiffs and Appellants.

Franscell, Strickland, Roberts, & Lawrence, Tracy Strickland and S. Frank Harrell for Defendants and Respondents.

---

## OPINION

**CROSBY, J.**—A lion produced a mouse. A seven-week jury trial in a lawsuit seeking hundreds of thousands of dollars in damages resulted in a verdict that a single sheriff's deputy committed a civil rights violation, with an award of $3,380 in compensatory and $1,000 in punitive damages.

Plaintiffs sought almost $250,000 in attorney fees for achieving this victory, which was pyrrhic in every respect save the potential of the fee request. But the court went beyond a mere denial. Acting under the misconception that turnabout is fair play, it awarded nearly the same amount (some $240,000) for *defendants'* attorney fees.

We hold the court had discretion to taketh away, but no discretion to giveth. Because of plaintiffs' extremely limited success on their civil rights claims, we follow *Farrar v. Hobby* (1992) 506 U.S. 103 [113 S.Ct. 566, 121 L.Ed.2d 494] and leave each side to bear its own attorney fees.

Plaintiffs' other grounds for reversal are without merit. They complain the denial of their right to introduce conspiracy evidence was "error *per se*," but we know of no such rule of automatic reversal in civil cases. And remanding this litigation for additional months of trial to recover a nominal $1 damage award on a pattern or practice theory under *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658 [98 S.Ct. 2018, 56 L.Ed.2d 611] (hereafter *Monell*) would be futile and unnecessary. This case, having overstayed its welcome, does not deserve a return visit.

### I

The underlying incident took place in the early morning hours of October 13, 1991, when plaintiffs Shawn Choate and Jose Bernal admittedly "provoked" some off-duty sheriff's deputies into a "street fight."

Choate, then 19 years old, and Bernal, age 20, passed the evening drinking and partying with a third friend, 17-year-old Albert Valladares, a member of the "Old Town Boys" street gang. They ended up at the Dana Point apartment of Choate's 14-year-old girlfriend. Across the street defendant Brian Scanlan was hosting a birthday party at his condominium for about 10 to 20 people. Both Scanlan and many of his guests were off-duty sheriff's deputies.

The party ended between 1:00 and 2:00 a.m. As three of the guests were walking to their cars, they were confronted by a heavily intoxicated Valladares, followed by about three or four other males. Valladares was verbally combative, profane and lewd, especially to Kim Anderson, who was with her boyfriend, defendant Pat Higa. Higa repeatedly said "we didn't want any problems, we just wanted to leave the area," but to no avail. Valladares took a flying kick at defendant Kurt Bourne's head.

Fearing they were outnumbered, Higa tried for a quick exit: "I didn't want this thing to escalate. . . . My thing was [to] cut our losses and just leave the area." As Higa was walking towards his car, Valladares swung at him and hit his left jaw. Despite this, Higa "made a bee line straight for my car," but Valladares kicked the car door and shattered the driver's window. Anderson ran back for help.[1]

Scanlan and two remaining party guests (off-duty Sheriff's Deputy Doug Doyle and a civilian friend Sam Samawi) responded. They saw some eight to twelve people advancing on Higa, making hostile, belligerent and threatening statements. They chased the men into an alley. Choate picked up a board and "swung [it] like a baseball bat," shouting, "Do you want to die, motherfucker?"[2] Bernal hit Samawi in the head with a brick. Valladares wildly swung a metal pipe.

Choate, Bernal, and Valladares were overpowered within five to eight minutes, "real quick." There were conflicting stories about how this occurred. Choate's girlfriend and her mother, for example, reported seeing Choate hit in the head at least three times with a big flashlight. Other eyewitnesses said plaintiffs repeatedly were told to "just lie still, the police will be here in a minute," and "[p]lease calm down. . . . We're just trying to control you."

Two on-duty sheriff's deputies, defendants Mark Billings and James DeKruif, responded to emergency calls just as the fracas was ending. Bernal, Choate, and Samawi were taken to a medical center for treatment. Bernal subsequently pleaded guilty to disturbing the peace. No charges were filed against Choate.

Plaintiffs sued the off-duty sheriff's deputies and civilian Samawi for "brutally attack[ing]" them during the fight. Billings and DeKruif, the

---

[1]Choate characterized Valladares as a violent person, who liked to cause trouble; Valladares agreed this was an accurate description "back then, yeah." He in turn called Choate "real aggressive," known for drinking and fighting.

[2]Choate admitted this during his deposition: "I said, 'Come on. Let's go. Let's fight.' " At trial he further conceded that he might have challenged the men to a fight: "It might have happened, yes."

on-duty deputies, were sued for conspiring "to give their off-duty colleagues enough time to 'finish the plaintiffs off' " and for endeavoring "to cover up the incident by . . . filing knowingly false and misleading police reports." The complaint, filed in January 1993, contained 11 causes of action, including battery, conspiracy, and federal civil rights. (42 U.S.C. § 1983.) It included a *Monell* cause of action against the county, alleging the sheriff's department had an official policy or custom of condoning unconstitutional conduct and conducting a "corrupt, whitewash investigation into the plaintiff's complaints." (*Monell, supra,* 436 U.S. 658.)

The court bifurcated the *Monell* claim from the other causes of action. Deputies Higa, Scanlan, Bourne and Doyle were represented by separate counsel. Bernal briefly testified and then disappeared. The court struck his testimony because he could not be cross-examined.

After an extensive discussion, the court nonsuited plaintiffs' conspiracy claims. Plaintiffs voluntarily dropped their negligence cause of action and conceded they lacked evidence against the responding deputies, Billings and DeKruif, except on the cover-up conspiracy charges. The court granted a nonsuit as to Doyle and Higa on the 42 United States Code section 1983 claims, finding they acted for personal reasons as private citizens and not under color of law. It denied a nonsuit on this same predicate issue as to Scanlan and Bourne because of conflicting evidence as to whether they had described themselves as police officers.[3]

The jury was given special verdict forms as to the remaining defendants and causes of action. It determined Scanlan and Bourne were acting under color of law. Choate recovered $3,380 in compensatory damages and $1,000 in punitive damages on excessive force and battery theories against Scanlan. Bernal recovered $1,089 in compensatory damages and $250 in punitive damages against Scanlan and Samawi on a battery theory. The jury exonerated the other defendants.

Following the verdict, the court dismissed the *Monell* claim as moot. It denied plaintiffs' motion for a new trial and for an additur.

The court denied plaintiffs' fee request for $248,647 in section 1988 attorney fees, but awarded fees of $241,644 to all defendants (except Scanlan) because plaintiffs' civil rights causes of action were frivolous and

---

[3]To be held liable under 42 United States Code section 1983, a person must act "under color of law." (See, e.g., *Huffman v. County of Los Angeles* (9th Cir. 1998) 147 F.3d 1054, 1058 [intoxicated off-duty deputy who fatally shot fellow patron during a barroom brawl did not act under color of law].) The court concluded that Bourne and Scanlan might have acted under "color of law" because bystanders heard them identified as being from law enforcement.

without merit. (42 U.S.C. § 1988.) It described plaintiffs as "several of Dana Point's more notorious local hooligans" who sought "unprovoked combat" for the fun of antagonizing "apparently passive victims." It concluded, "not even the most wildly imaginative attorney would *think* of suing on these facts."

## II

Plaintiffs claim their damage awards are inadequate as a matter of law, requiring a new trial on damages or an additur. They overstate our limited role in reviewing the fact question of the amount of damages.

Unlike the jury and the trial judge, we did not see, or hear the witnesses and cannot resolve evidentiary conflicts regarding the severity of injuries or their cause. (*Abbott v. Taz Express* (1998) 67 Cal.App.4th 853, 855 [79 Cal.Rptr.2d 360] ["[B]etween black and white are various shades of gray, and all of the colors of the rainbow as well. What constitutes fair and reasonable compensation in a particular case is a question of fact . . ."].)

Choate's recovery under the federal civil rights law (42 U.S.C. § 1983) does not change the equation. Constitutional torts employ the same measure of damages as common law torts and are not augmented "based on the abstract 'value' or 'importance' of constitutional rights . . . ." (*Memphis Community School Dist. v. Stachura* (1986) 477 U.S. 299, 310 [106 S.Ct. 2537, 2545, 91 L.Ed.2d 249].) Plaintiffs have the burden of proving compensatory damages in section 1983 cases, and the amount of damages depends "largely upon the credibility of the plaintiffs' testimony concerning their injuries." (*Butler v. Dowd* (8th Cir. 1992) 979 F.2d 661, 669.) A finding of excessive force does not entitle plaintiffs to compensatory damages as a matter of law—both justifiable and excessive force may have been used. (*Gibeau v. Nellis* (2d Cir. 1994) 18 F.3d 107.)

In *Gibeau* the Second Circuit refused to remand for a new trial on inadequate damages even though the evidence showed a prison guard struck an inmate at least three times in the head with a heavy flashlight. The court observed, "It is possible that the jury considered only the last blow to be excessive, and it may have concluded that the head contusion was caused by the first blow." (*Gibeau v. Nellis, supra,* 18 F.3d at p. 110.) As in *Gibeau*, the jury's findings against Scanlan do not necessarily mean that all the force he used was objectively unreasonable or that Choate's evidence was to be taken at face value. Perhaps the jurors concluded that defendants unnecessarily prolonged the confrontation but plaintiffs' injuries had already occurred.

It also may be that the jury concluded plaintiffs' evidence regarding the extent of their injuries and the manner in which they were inflicted was not

credible, or only marginally credible. (*Butler v. Dowd, supra*, 979 F.2d at p. 672.) Various eyewitnesses contradicted their depiction of events, stating, for example, "[t]here was no bashing of heads or anything . . . like that going on at all." And the treating paramedic reported "no significant negative findings" as to Choate, and Bernal was alert with a "minor head injury resulting from a fight."[4] We simply are not in a position to second-guess these factual determinations.

## III

■ We turn now to the fee awards, by far and away the biggest monetary component of the case. There is nearly a gap of half a million dollars between the fees sought by plaintiff and the court-awarded fees to defendants. The trial court got it half right, we think.

## A

Defendants are *not* entitled to attorney fees merely because they prevailed on all or most of plaintiffs' civil rights claims. ■ While the attorney fee provision in 42 United States Code section 1988 makes no distinction between prevailing plaintiffs and defendants,[5] the United States Supreme Court has developed more stringent standards for the latter than for the former. (*Hughes v. Rowe* (1980) 449 U.S. 5, 14 [101 S.Ct. 173, 178, 66 L.Ed.2d 163].) Attorney fees ordinarily are awarded to prevailing civil rights plaintiffs unless special circumstances render such an award unjust. (*Farrar v. Hobby, supra,* 506 U.S. 103.) In contrast, however, prevailing civil rights *defendants* can recover attorney fees *only* where the court also finds that the civil rights claim was objectively " 'frivolous, unreasonable or groundless, or that the plaintiff continued to litigate after it clearly became so.' " (*Hughes, supra*, 449 U.S. at p. 15 [101 S.Ct. at p. 179]; see also *Del Rio v. Jetton* (1997) 55 Cal.App.4th 30, 34-35 [63 Cal.Rptr.2d 712].)

Why the double standard? That is because of the need to encourage "vigorous enforcement of good faith civil rights claims . . . ." (*Del Rio v. Jetton, supra,* 55 Cal.App.4th at p. 35.) Private citizens should not forgo the

---

[4]Indeed, one witness intimated that Bernal may have been accidentally injured by "glancing blows" from Valladares, who was swinging the "unwieldy" metal pipe. His damage award is not legally insufficient merely because it coincides with the amount of his medical specials. (*Randles v. Lowry* (1970) 4 Cal.App.3d 68, 73-74 [84 Cal.Rptr. 321] [declining to presume that plaintiff received nothing for pain and suffering because damage award equaled his medical specials].)

[5]Title 42 United States Code section 1988(b) provides that, in certain specified civil rights cases, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ."

opportunity to vindicate core federal rights because they lack financial resources or because they fear they will have to pay the other side's attorney fees if they lose. (*Id.* at pp. 34-35.) The specter of attorney fees should chill only vexatious plaintiffs who bring meritless lawsuits to settle scores, not disputes. (*Id.* at p. 35 ["Suits filed with no real hope of victory needlessly bring defendants through the costly and agonizing uncertainty of defending suit"].)

 Whatever criticism may be levied against the prosecution of this case, it manifestly was not clearly frivolous or brought solely for harassment without hope of success. Choate and Bernal sustained real injuries as a result of their encounter with Scanlan and the other party guests, some of whom were found to be acting under color of law. Notwithstanding the trial court's characterization of plaintiffs as "hooligans" and "pugnacious drunks" (characterizations with which we do not necessarily agree), they did not thereby forfeit their claims to constitutional protection and certainly did not deserve *whatever* they got.

It is not unusual to have difficulty identifying who in a melee is responsible for what. In *Perez v. City of Huntington Park* (1992) 7 Cal.App.4th 817 [9 Cal.Rptr.2d 258], the appellate court affirmed a judgment against a public entity even though the trial judge (acting as the trier of fact) was unable to determine which of four officers hit the plaintiff and ruled in favor of the individual defendants. The court stated, "Morally, [the city] should be liable to [the plaintiff] in these circumstances. The procedural fact that [he] named and joined the employees (but was unable at trial to identify them) should not be controlling, in light of the substantive finding that two of [the city's] employees committed tortious acts." (*Id.* at pp. 821-822.)

All the defendants named and served by plaintiffs were directly involved in the incident. This is not a situation where plaintiffs insisted, in the face of uncontroverted evidence, on proceeding against individuals who had no conceivable role in contributing to their injuries. Even the trial court recognized the murkiness of the evidence regarding "just who did what to whom[.] [S]uffice it to say the court was reminded of nothing so much as the parable of the several blind men examining and describing the elephant." Based on the record before us, the court erred in awarding attorney fees to defendants.

B

 Choate's entitlement to attorney fees is another story. For United States Code section 1988 fees, we review the court's decision for abuse of

discretion because of its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." (*Hensley v. Eckerhart* (1983) 461 U.S. 424, 437 [103 S.Ct. 1933, 1941, 76 L.Ed.2d 40].) ▮ This discretion was not abused.

There is no dispute that Choate, having recovered money damages from Scanlan, was a "prevailing party" within the meaning of 42 United States Code section 1988, and thereby potentially entitled to attorney fees. (*Farrar v. Hobby, supra,* 506 U.S. at p. 115 [113 S.Ct. at p. 575].) But that does not end the matter. As Justice O'Connor observed, section 1988 is not "a relief Act for lawyers" who accomplish no public goal "other than occupying the time and energy of counsel, court, and client." (506 U.S. at pp. 121-122 [113 S.Ct. at p. 578] (conc. opn. of O'Connor, J.).) As in *Farrar,* special circumstances support the trial court's discretionary decision not to award fees.

▮ Sometimes, as *Farrar* holds, a reasonable fee is zero, especially where the recovery is de minimis, establishes no important precedent and does not change the relationship of the parties. According to *Farrar,* the "most critical" factor for determining the reasonableness of the fee award is " 'is the degree of success obtained.' " (*Farrar v. Hobby, supra,* 506 U.S. at p. 114 [113 S.Ct. at p. 574].) Where the purpose of a civil rights action is to recover private damages, *Farrar* continues, the court, in fixing fees, must " 'give primary consideration to the amount of damages awarded as compared to the amount sought.' " (*Ibid.,* quoting *City of Riverside v. Rivera* (1986) 477 U.S. 561, 585 [106 S.Ct. 2686, 2700, 91 L.Ed.2d 466] (conc. opn. of Powell, J.).) We apply this analysis here. (See also *Sintra, Inc. v. City of Seattle* (1997) 131 Wash.2d 640 [935 P.2d 555, 568] [reversing 42 U.S.C. § 1988 fee award where trial court chiefly considered factors other than degree of success "such as the difficulty of the case, the undesirability of the case, and the level of skill necessary to pursue the case properly . . . . This was error"].)

The *Farrar* plaintiffs sought $17 million in damages from six defendants, but recovered only $1 from one of them. Despite this, they were awarded $280,000 in attorney fees. The Supreme Court reversed; while the plaintiffs were prevailing parties, their failure to recover actual damages or establish a significant precedent militated against any fee award. With regard to the reasonableness prong of 42 United States Code section 1988 fees, the court noted that "[w]hen a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief . . . the only reasonable fee is usually no fee at all." (*Farrar v. Hobby, supra,* 506 U.S. at p. 115 [113 S.Ct. at p. 575].) The "moral satisfaction" of knowing there was a constitutional rights violation, standing alone, did not justify a fee award there. (*Id.* at p. 114 [113 S.Ct. at p. 574].) Fees may only be

considered in relation to the extent of success obtained by the plaintiffs via damages or other relief. (*Id.* at pp. 115-116 [113 S.Ct. at p. 575].)

 Considering Choate's limited success, the court did not abuse its discretion under *Farrar* by dispensing with the lodestar and awarding no fees. *Farrar* encompasses *any* de minimis damage award. (See, e.g., *Morales v. City of San Rafael* (9th Cir. 1996) 96 F.3d 359, mod. 108 F.3d 981 [" 'Nominal damages' is not limited to an award in the amount of $1, but includes an award that may properly be classified as 'de minimis' "]; *Adams v. Rivera* (S.D.N.Y. 1998) 13 F.Supp.2d 550 [denying 42 U.S.C. § 1988 fees to plaintiff who sought over $1.4 million in compensatory and punitive damages in excessive force case, but recovered only $1,000]; *TCI of Illinois, Inc. v. Carpenter* (N.D.Ill. 1994) 849 F.Supp. 326, 327-328 [no statutory fees to plaintiff who sought $100,000 but received only $420], disapproved on other grounds in *Simpson v. Sheahan* (7th Cir. 1997) 104 F.3d 998, 1002, fn. 3.)

The *Farrar* exception thus distinguishes section 1988 fees from statutory fees available to California plaintiffs who prevail under the Unruh Civil Rights Act. (Civ. Code, § 51 et seq.) In *Engel v. Worthington* (1997) 60 Cal.App.4th 628 [70 Cal.Rptr.2d 526], we held that attorney fees are mandatory for prevailing parties under that statute, with trial courts only possessing discretion "to determine the amount of the fees, but not their entitlement." (*Id.* at p. 632.) *Farrar* gives 42 United States Code section 1988 courts greater leeway to determine fee entitlements based upon the "degree of success" obtained. (*Farrar v. Hobby, supra,* 506 U.S. at p. 114 [113 S.Ct. at p. 574].)

We acknowledge the public interest in encouraging victims of even relatively minor constitutional violations to file United States Code section 1983 suits. That is because, as Judge Posner has explained, "the cumulative effect of petty violations of the Constitution arising out of the interactions between the police (and other public officers) and the citizenry on the values protected by the Constitution may not be petty . . . ." (*Hyde v. Small* (7th Cir. 1997) 123 F.3d 583, 585.) Attorney fees appropriately issue to civil rights plaintiffs who "aim[] small and obtain[] an amount that is significant in relation to that aim (it need not reach the target) . . . even if the case establishes no precedent." (*Ibid.*)[6]

Yet, as Judge Posner also recognized, there is an equally strong civic value in discouraging civil rights claims from being overlitigated in disproportion to the dollars and constitutional interests at stake and "in the process

---

[6]For example, in *Wilcox v. City of Reno* (9th Cir. 1994) 42 F.3d 550, the Ninth Circuit affirmed a district judge's discretion to award $66,500 in 42 United States Code section 1988 fees to a man who recovered only $1 in nominal damages on his excessive force lawsuit against a police officer who punched him in the face while he was handcuffed in a holding

inflicting heavy costs on [the government] opponent[s] and wasting the time of the court . . . ." (*Hyde v. Small, supra,* 123 F.3d at p. 585.) The trial court was in the best position "to ascribe a reasonable value to the lawyering it has witnessed and the results that lawyering has achieved." (*Wilcox v. City of Reno, supra,* 42 F.3d at p. 555.)

There was sufficient basis in this record to determine that plaintiffs' de minimis recovery merited a de minimis (zero) fee award. Choate recovered far less than he wanted, and Bernal gained nothing under 42 United States Code section 1983. Mostly, plaintiffs lost and defendants (except Scanlan) won. There was a substantial difference between the millions sought and the paltry recovery obtained. Only plaintiffs—the ostensible victors—moved for a new trial and filed a notice of appeal. The verdict did not alter the parties' relationship in any significant manner, nor did it confer a benefit on society. The exceedingly modest verdict created no new rule of liability, broke no ground, and sent no message. Choate's counsel himself had one word for the result: "Outrageous." At oral argument he called the amount awarded a "pittance."

Even the very small punitive award against Scanlan supported the inference that it was imposed for the state battery claim (conceivably for his misconduct as a civilian), not for any actions undertaken by him under color of law for which federal civil rights liability was imposed. We know of no case holding that an exceedingly modest punitive award, which reasonably may have been imposed on a common law cause of action because of civilian (i.e., nongovernmental) misconduct, *compels* a fee award for a case which "accomplished essentially nothing other than consuming substantial time, energy, and resources of this Court and the judicial process." (*Adams v. Rivera, supra,* 13 F.Supp.2d at p. 553.)

Again, we stress the determination whether a victory is de minimis is generally left to the sound equitable discretion of the trial court in the first instance "so as to avoid a second major litigation strictly over attorneys' fees." (*Cartwright v. Stamper* (7th Cir. 1993) 7 F.3d 106, 109-110 [district

area and who was drunk and verbally abusive. As a result of the lawsuit, the police officer was disciplined and the department changed its official policy to prohibit closed-fist strikes to the face. *Wilcox* affirmed the trial court's authority to make discretionary determinations of the extent of the plaintiff's success: "We cannot say in these circumstances that the District Court's finding . . . was clearly erroneous. Predictably, Wilcox argued that it did result in an improved policy, while the City argued that it did not. The District Court was free, within the bounds of the clearly erroneous standard, to find that the lawsuit did benefit the police department." (*Id.* at p. 556.) *Wilcox* underscores the discretion vested in the trial court to make such determinations—the outcomes of which will inevitably vary with the decision maker. (*Id.* at p. 555.) That is the very nature of a discretionary decision.

court noted plaintiffs' " 'limited success in comparison to the scope of the litigation as a whole' "].) In short, the trial court had sufficient grounds to conclude that Choate's self-characterized recovery of a "pittance" in compensatory and punitive damages from Scanlan created no significant precedent that likely would alter the behavior of on-duty law enforcement officers. (*Id.* at p. 110 [" 'the "external benefits" or future deterrent effect of this action is limited' "]; see also *Farrar v. Hobby, supra,* 506 U.S. at p. 121 [113 S.Ct. at p. 578] (conc. opn. of O'Connor, J.) ["one searches . . . in vain for the public purpose this litigation might have served"].) We find no abuse here.

## IV

Plaintiffs challenge the dismissal of their *Monell* cause of action against the county, arguing they had an "absolute right" to a *Monell* trial phase "even if only for an award of nominal additional damages" of $1. They claim the sheriff's department violated their Fourth Amendment right to be free from unreasonable search and seizure through its "reckless indifference in hiring, training, disciplining its employee officers, and in conducting sham investigations of complaints of police misconduct."[7]

The trial court considered this claim to be moot because the county, acting pursuant to Government Code section 825, subdivision (a) had already agreed to pay the jury award: "[T]he injury caused by any police officer will be fully compensated, thus litigating against the county for the exact same damages which have already been paid is basically a waste of time."[8] The court did not abuse its discretion in determining the instant *Monell* pattern or practice claim to be unnecessary since the judgment would be paid out of the county's deep pockets. We explain below.

## A

In interpreting federal statutes such as 42 United States Code section 1983, we are bound to follow controlling opinions of the United States Supreme Court, but are not bound to follow federal circuit or district court

---

[7]Only Choate, not Bernal, may raise this argument. Unlike for Choate, the jury found no violation of Bernal's federal civil rights. Since there was no predicate constitutional violation, Bernal cannot proceed under *Monell.* (*City of Los Angeles v. Heller* (1986) 475 U.S. 796, 799 [106 S.Ct. 1571, 1573, 89 L.Ed.2d 806].)

[8]Government Code 825, subdivision (a) provides, "[I]f an employee . . . of a public entity requests the public entity to defend him or her against any claim or action against him for an injury arising out of an act or omission occurring within the scope of his or her employment as an employee of the public entity . . . the public entity shall pay any judgment based thereon . . . ." Plaintiffs do not dispute the county's commitment to compensate them for the damage award.

decisions. (*Garcia v. Superior Court* (1996) 42 Cal.App.4th 177, 181 [49 Cal.Rptr.2d 580].) Since the United States Supreme Court has not directly spoken on the issue of *Monell* mootness, we look for guidance to its recent decisions regarding *Monell* and related subjects, as well as to lower court decisions and sound principles of judicial administration.

■ Local governments have no liability under 42 United States Code section 1983 simply because their employees may have violated a plaintiff's constitutional rights; the doctrine of respondeat superior does not apply. (*Monell, supra,* 436 U.S. at p. 691 [98 S.Ct. at p. 2036].) No punitive damages can be awarded against a public entity. (*City of Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 271 [101 S.Ct. 2748, 2762, 69 L.Ed.2d 616]).

The United States Supreme Court has carved out a limited area of direct municipal responsibility "if the deprivation of rights was caused by an official policy or custom of the county, set by the county's lawmakers or by an official who speaks with final policymaking authority for the county." (*County of Los Angeles v. Superior Court* (1998) 68 Cal.App.4th 1166, 1168 [80 Cal.Rptr.2d 860].) At most, *Monell* liability adds an additional defendant, a municipality, to the universe of actors who will be jointly and severally liable for the award.

Entity liability may arise in one of two forms. The municipality may itself have directed the deprivation of federal rights through an express government policy. This was the situation in *Monell*, where there was an explicit policy requiring pregnant government employees to take unpaid leaves of absence before such leaves were medically required. (See also *Pembaur v. Cincinnati* (1986) 475 U.S. 469, 485 [106 S.Ct. 1292, 1301, 89 L.Ed.2d 452] [county prosecutor, acting as the county's final decision maker, directed deputies to unlawfully enter petitioner's place of business].)

Alternatively, the municipality may have in place a custom or practice so widespread in usage as to constitute the functional equivalent of an express policy. Pattern or practice lawsuits involve far-reaching inquiries into how police departments train and discipline their officers. The Supreme Court has viewed them skeptically: "Rigorous standards of culpability and causation must be applied" to ensure that the municipality, through culpable misconduct, was the "moving force" behind the injury alleged. (*Board of County Comm'rs of Bryan Cty. v. Brown* (1997) 520 U.S. 397, 404-405 [117 S.Ct. 1382, 1388, 137 L.Ed.2d 626] (hereafter *Bryan County*).)

The *Monell* doctrine "has produced a body of law that is neither readily understood nor easy to apply. . . . [¶] . . . [¶] [This] makes it difficult for

municipalities to predict just when they will be held liable based upon 'policy or custom.' " (*Bryan County, supra,* 520 U.S. at pp. 433, 436 [117 S.Ct. at pp. 1402, 1403] (dis. opn. of Breyer, J.).) If there is any pattern to *Monell* decisional law, it is a crazy quilt. (Hamilton, *The Importance and Overuse of Policy and Custom Claims: A View from One Trench* (1999) 48 DePaul L.Rev. 723, 728 (Hamilton) ["We are not dealing here with a rationally designed system of legal doctrines"].)[9]

The Supreme Court has expressed its disinclination to issue advisory decisions on *Monell.* Most notably, in *City of Los Angeles v. Heller, supra,* 475 U.S. at page 799 [98 S.Ct. at page 1573], the court refused to permit an abstract trial on the constitutionality of the use of a carotid chokehold by the Los Angeles Police Department. The plaintiff in *Heller* was injured during a drunk-driving stop when the arresting officer attempted to place him in such a chokehold. Reversing the Ninth Circuit, the Supreme Court ordered the *Monell* claim dismissed because the jury determined that a constitutional violation had not occurred. Once this issue was removed from the case, "the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (*Ibid.,* italics omitted.)

A number of federal courts have applied the *Heller* rationale to the instant scenario. In such situations, an additional *Monell* trial "has little, probably no, practical significance. . . . [S]ince the City indemnifies its employees for damage awards made against them in respect of the torts they commit in the course of their employment, [plaintiff] will collect his judgment in full whether or not the City is held liable." (*Jones v. City of Chicago* (7th Cir. 1988) 856 F.2d 985, 995; see also *Sanchez v. City of Riverside* (C.D.Cal. 1984) 596 F.Supp. 193, 195 ["The issues of 'government custom' and negligent supervision have been rendered hypothetical by . . . the City's recognition of its obligation under state law to pay the judgment"]; see also Hamilton, *supra,* 48 DePaul L.Rev. at p. 730.)

In *George v. City of Long Beach* (9th Cir. 1992) 973 F.2d 706, the Ninth Circuit affirmed the dismissal of an arrestee's *Monell* claim against a

---

[9]Three Supreme Court justices have suggested jettisoning *Monell* for respondeat superior. (*Bryan County, supra,* 520 U.S. at p. 431 [117 S.Ct. at p. 1401] (dis. opn. of Breyer, J.) ["The soundness of the original principle is doubtful"].) Justice Breyer cited the fact that many states (like California) have statutes that "in effect, mimic respondeat superior by authorizing indemnification of employees found liable under § 1983 for actions within the scope of their employment." (*Id.* at p. 436 [117 S.Ct. at p. 1404], italics omitted.) To the extent that such statutes provide for payments from entities rather than individuals, "reliance upon the continuation of *Monell*'s 'policy' limitation loses much of its significance." (*Ibid.*)

municipal police department after the officers had been found to have violated his constitutional rights during a warrantless "no knock" entry. Like Choate, the arrestee argued he was entitled to a *Monell* trial on the "symbolic" issue of his right to recover nominal damages for the municipality's pattern or practice of condoning constitutional violations and poorly training its police officers. Finding the error (if any) to be harmless, *George* held the following: "Any damages resulting from a possible *Monell* claim would result from the same constitutional violation of the warrantless arrest which resulted in nominal damages. Even if George were to prove the City failed to adequately train the police officers, the result would simply be another theory of action concerning the conduct . . . . George's recovery, if any, based upon a *Monell* claim would be limited to nominal damages. *We therefore hold that any error by the district court in dismissing the Monell claim was harmless.*" (*George*, at p. 709, italics added.)[10]

There are several contrary opinions. In *Amato v. City of Saratoga Springs, N.Y.* (2d Cir. 1999) 170 F.3d 311, the Second Circuit remanded an excessive force case for a new trial on *Monell* "to seek symbolic vindication from the municipality as well as the individual official for violation of constitutional rights," even though the plaintiff's recovery would be limited to nominal damages. (*Id.* at p. 321.) And in *Ruvalcaba v. City of Los Angeles* (9th Cir. 1999) 167 F.3d 514, a plaintiff appealed from the dismissal of his *Monell* claim after the jury determined he was entitled to $60,400 in compensatory damages because of a police officer's use of excessive force in making an arrest. The appeals court agreed, holding the arrestee "may still recover nominal damages for a 'separate and distinct [constitutional] wrong' irrespective of whether he is entitled to actual damages for that wrong." (*Id.* at p. 524.) The court did not identify that "separate and distinct" wrong, and it did not mention *George* or attempt to reconcile the conflict.

 We agree with *Jones, George, and Sanchez* and disagree with *Amato* and *Ruvalcaba*. First, we believe the Supreme Court would follow its own rationale in *Heller*: Once a plaintiff has been fully compensated, a second trial to establish *Monell* liability would be "quite beside the point." (*City of Los Angeles v. Heller, supra,* 475 U.S. at p. 799 [106 S.Ct. at p. 1573].) Why

---

[10]*George* belies plaintiffs' reliance upon *Carey v. Piphus* (1978) 435 U.S. 247 [98 S.Ct. 1042, 55 L.Ed.2d 252] to establish a supposed "absolute right to trial of the *Monell* cause of action, even for *nominal* damages alone, once, as here, constitutional violation of an absolute constitutional right by the individual defendant has been found." In *Carey* the Supreme Court refused to allow students who were suspended without a hearing to recover compensatory damages because the district had good cause to suspend them. Despite the procedural due process violation, their damages were limited to $1. (*Carey, supra,* 435 U.S. 247.) *Carey* has nothing to do with a *Monell* pattern or practice claim.

litigate the issue of municipal liability in the abstract when the municipality already has accepted it in reality?[11]

Second, a separate *Monell* trial for nominal damages would be expensive in time and resources to prove (or refute) a widespread pattern or practice of misbehavior. This is particularly true for large urban law enforcement agencies such as the Orange County Sheriff's Department. Moreover, the possibility exists that departments with serious structural problems could use a nominal *Monell* defense verdict as a clean bill of health, thereby delaying needed reforms.[12]

Third, the expense of *Monell* pattern or practice litigation would unduly inflate the settlement value of suits like this one. The prospect of a wasteful and protracted *Monell* trial can be too easily misused to expand the settlement value of such claims. As the concurring judge in *Amato* observed, "Many thousands of dollars would be expended [on] this one-dollar lawsuit, money that the citizens of Saratoga Springs may judge better spent on a school crossing-guard or a part-time music teacher. These burdens on the court, and on the taxpayers . . . would outweigh—hands down—the benefits of remand that the majority opinion identifies." (*Amato v. City of Saratoga Springs, supra,* 170 F.3d at p. 323 (conc. opn. of Jacobs, J.).)

Fourth, *Monell* pattern or practice claims raise problems of federalism. For law enforcement, they implicate virtually every aspect of a police department's operations, including hiring, training, discipline, tactical operations and investigations. The United States Supreme Court has been highly sensitive to "serious federalism concerns, in that it risks constitutionalizing particular . . . requirements that States have themselves elected not to impose." (*Bryan County, supra,* 520 U.S. at p. 415 [117 S.Ct. at p. 1394]; see also *Collins v. Harker Heights* (1992) 503 U.S. 115, 129 [112 S.Ct. 1061,

---

[11]The absurdity of such a retrial is demonstrated by the Second Circuit's suggestion that municipalities could avoid it by *defaulting* on the judgment and paying nominal damages. (*Amato v. City of Saratoga Springs, supra,* 170 F.3d at p. 321, fn. 11.) *Amato* reasoned that such an option "addresses the potential concern that the cost involved in hearing [the plaintiff's] claim against the City and the Police Department outweighs any societal interest in allowing [the plaintiff] to pursue a claim that can only yield a judgment and one dollar in damages. The determination whether the opportunity to vindicate the reputation of the Department would offset the economic costs is one for these defendants to make." (*Ibid.*) But, as the concurring judge pointed out, such a resolution would be nonsensical from a policy standpoint since "the trivial amount at issue in the *Monell* trial virtually assures that a loss by the municipality would have no collateral estoppel effect. [Citation.] It is therefore just as likely that a second trial would benefit the plaintiff only as an act *of spite designed to inflict expense on the municipality and compel deference and attention to himself.*" (*Id.* at p. 323 (conc. opn. of Jacobs, J.).)

[12]Precisely what type of a message does a verdict for $1 nominal damages send in a complicated pattern or practice case? *This is not a legislative or investigative report.*

1070, 117 L.Ed.2d 261] [decisions regarding civil liability standards that "involve a host of policy choices . . . must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country"]; *Rizzo v. Goode* (1976) 423 U.S. 362, 366 [96 S.Ct. 598, 602, 46 L.Ed.2d 561] [citing an "unwarranted intrusion by the federal judiciary" into state and local discretionary decisions regarding how to handle police misconduct claims].)

We see little purpose to an open-ended *Monell* trial on pattern or practice liability here or most cases. (*Sanchez v. City of Riverside, supra,* 596 F.Supp. at pp. 194-195 ["Plaintiffs' claims against the City allege no wrong not alleged against the police officer or no injury or damages proximately caused thereby different from the injury or damages sought against the police officer defendant"].) Since plaintiffs will be fully compensated by the damage awards they have secured, there is nothing further to litigate because there is nothing further for them to recover. In Judge Hamilton's words, in "a substantial proportion of the cases asserting *Monell* claims based on alleged practices or customs, the *Monell* claims should have little practical significance." (*Hamilton, supra,* 48 DePaul L.Rev. at p. 729.) This is precisely such a situation.

We raise two important caveats. Our decision does not apply to situations where the entity has refused to indemnify, nor does it extend to *express* departmental policies that are unconstitutional. (See, e.g., *Blackburn v. Snow* (1st Cir. 1985) 771 F.2d 556, 571 [municipal liability based on sheriff's order requiring body cavity strip searches for all county jail visitors].) This leaves unaffected what amounts to the core of *Monell*: municipal policies or actions by municipal policymakers that are violative of federal law or that direct or authorize deprivations of civil rights. (See *Bryan County, supra,* 520 U.S. at pp. 406-407 [117 S.Ct. at pp. 1389-1390].)

Such circumstances, however, are not presented in this case, where plaintiffs' pattern or practice claims involve unrelated instances of misfeasance, malfeasance, and negligence.

## B

Our conclusion comports with California law on harmless error and nominal damages. (*Sill Properties, Inc. v. CMAG, Inc.* (1963) 219 Cal.App.2d 42, 55 [33 Cal.Rptr. 155] ["In the absence of special circumstances the error would be of no consequence since the law does not regard trifles and courts will not reverse a judgment simply because nominal damages were not awarded"].) In *Staples v. Hoefke* (1987) 189 Cal.App.3d 1397 [235 Cal.Rptr. 165], a commercial tenant argued it was entitled to nominal damages for

trespass because of sound vibrations from the adjoining premises even though the jury determined such vibrations did not damage its business operations. The court declined to do so, applying the general "harmless error" rule that "a judgment will not be reversed for a failure to award nominal damages . . . ." (*Id.* at p. 1406.)

There are no special circumstances here. Far from supporting an unwieldy *Monell* pattern or practice claim, public policy sustains dismissal where the public entity has accepted responsibility to pay compensatory damages.

## V

Plaintiffs' efforts to secure a retrial on a conspiracy theory following the nonsuit by the trial court are without merit. They claim the off-duty deputies engaged in a conspiracy to unlawfully "fail[] to intervene in the criminal acts of assault and battery on plaintiffs" and that all deputies, on- and off-duty, conspired to cover up their initial liability by "successfully conceal[ing], or fabricat[ing] so much evidence." Thus, plaintiffs allege *two* conspiracies: "One, to batter the plaintiffs and, two, to lie about it."

That is a tall order. While criminal conspiracies involve distinct substantive wrongs, civil conspiracies do not involve separate torts. The doctrine provides a remedial measure for affixing liability to all persons who have "agreed to a common design to commit a wrong." (*Agnew v. Parks* (1959) 172 Cal.App.2d 756, 762 [343 P.2d 118].)

Because civil conspiracy is so easy to allege, plaintiffs have a weighty burden to prove it. (*Hinkle v. City of Clarksburg, W. Va.* (4th Cir. 1996) 81 F.3d 416 [affirming summary judgment on cover-up conspiracy allegations].) They must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it. (*Id.* at p. 421.) It is not enough that the conspiring officers knew of an intended wrongful act, they had to agree—expressly or tacitly—to achieve it. Unless there is such a meeting of the minds, " 'the independent acts of two or more wrongdoers do not amount to a conspiracy.' " (*National Congress P.R. Rights v. City of New York* (S.D.N.Y. 1999) 75 F.Supp.2d 154, 168.)

"Bare" allegations and "rank" conjecture do not suffice for a civil conspiracy. (*Mahaney v. Warren County* (8th Cir. 2000) 206 F.3d 770, 772.) In *Hinkle* the plaintiffs relied upon evidence that "two white males in blue jackets" sneaked into the victim's apartment the day after a police shooting to support the inference that the defendant police officers conspired to destroy evidence. (*Hinkle v. City of Clarksburg, W. Va., supra,* 81 F.3d at p.

422, fn. 3.) The appeals court rejected such speculation as a "theory without proof," pointing out that "[t]here is a reason why we do not allow this level of conjecture to determine lawsuits: such adventures of the mind tend to be unreliable." (*Id.* at p. 423.)

For a "cover-up" conspiracy, plaintiffs must show the conspirators shared a common goal to intentionally conceal evidence (*Flores v. Satz* (11th Cir. 1998) 137 F.3d 1275, 1278, fn. 7) and that the "cover-up actually rendered all state court remedies ineffective." (*Delew v. Wagner* (9th Cir. 1998) 143 F.3d 1219, 1223.) The mere failure to investigate fully does not constitute a federal civil rights violation. (*Flores, supra,* 137 F.3d at p. 1278, fn. 7; see also *Feist v. Simonson* (D.Minn. 1999) 36 F.Supp.2d 1136 [inadequate evidence as matter of law to sustain conspiracy allegation that police officers conspired to "sabotage" plaintiffs' civil rights claims, notwithstanding minor variations in police reports and testimonial discrepancies by police officers].)

 Plaintiffs have fallen short of their burden of proof to establish a prima facie case of either of their two conspiracies. There is no evidence of a meeting of the minds among the alleged conspirators, either to batter plaintiffs or to intentionally cover up the attacks. There is no proof that defendants have rendered ineffective plaintiffs' state court remedies. To the contrary, the jury awarded money damages to both of them.[13]

Plaintiffs specifically point to testimony regarding injuries allegedly inflicted upon Bernal by "the fellow with the ponytail and short pants" (whom they call "Boots" after his footwear) who got off "scot-free" and was "never held to answer for his actions." They further claim that the identity of the "elusive 'Boots' " was "concealed by his fellow deputies and partygoers."

We are totally in the dark about "Boots" and about those others who conspired to kick him out of the picture. Who was this elusive (if not mythic) man? A party attendee? Meddling passerby? Rival gang member out for revenge? If there is any evidence to sustain conspiracy allegations regarding Boots's presence or absence (or defendants' responsibility for either), plaintiffs do not disclose it. We will not scour the record for facts that may not exist except in an *X-Files* episode.

---

[13]Defendants rightly point out that plaintiffs cannot magnify their damages by naming more conspirators. In *Watts v. Laurent* (7th Cir. 1985) 774 F.2d 168, a prison inmate sued five guards for their "deliberate indifference" to his personal safety while he was being attacked. The jury separately awarded $40,000 against each deputy, for an aggregate judgment of $200,000. The Seventh Circuit reversed, limiting total liability to $40,000: "[A]dditional judgments, against additional defendants merely provide additional sources of collection, not an enhanced standard of compensation." (*Id.* at p. 180.)

Plaintiffs' response is that their inability to prove anything about "Boots" only shows the conspiracy's success: "There's witnesses suppressed. We'll never know about them. . . . [T]hey continue to suppress that evidence . . . so we don't have a strong case as we would have liked . . . ."

This is a mind-boggling concept (the bigger the conspiracy, the less the proof), one worthy of Oliver Stone. The history of conspiracy, it has been observed, evidences the " 'tendency of a principle to expand itself to the limit of its logic.' " (*Krulewitch v. United States* (1949) 336 U.S. 440, 445 [69 S.Ct. 716, 719, 93 L.Ed. 790] (conc. opn. of Jackson, J.).) Tort law deals with the known or the should have known; it does not dwell in the realm of the unknown or the never-can-be-known. (See, e.g., *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 13-14 [74 Cal.Rptr.2d 248, 954 P.2d 511] [declining to recognize tort for intentional first party spoliation because "the fact of harm will be irreducibly uncertain. . . . The jury could only speculate as to what the nature of the spoliated evidence was and what effect it might have had on the outcome of the underlying litigation"].)[14]

The judgment is affirmed. The award of attorney fees to defendants is reversed, and the order denying attorney fees to plaintiffs is affirmed. In the interests of justice, the parties shall bear their own costs on appeal.

Sills, P. J., and Bedsworth, J., concurred.

A petition for a rehearing was denied January 17, 2001, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied March 28, 2001.

---

[14]We make one important qualification: We consider the issue of failure-to-intervene liability *solely* in conjunction with plaintiffs' conspiracy allegations. Limiting ourselves to the issues raised by plaintiffs on this appeal, we do not decide whether these defendants (or police officers in general) may be held *directly* and *individually* liable under 42 United States Code section 1983 for passively observing the use of constitutionally excessive force that could have been prevented. (See, e.g., *Ensley v. Soper* (11th Cir. 1998) 142 F.3d 1402, 1408 [police officers may be held liable for failing to intervene to halt excessive force, although "we see no evidence in the record that might show that [defendant] observed his fellow officers' alleged abuse of [plaintiff] or that he had opportunity to intervene"].)

Plaintiffs have not challenged the trial court's determination that Doyle and Higa (the off-duty deputies) were acting as civilians during the fight and not as police officers (thereby forestalling any duty to intervene), and that DeKruif and Billings (the on-duty deputies) arrived after the fight was virtually over, making them powerless to intervene.