<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 11-1704**

─────────────

GERALD R. TERRY; ANN T. ROBBINS; JANE T. EVANS, on their own behalf and on behalf of a class of others similarly situated,

        Plaintiffs – Appellants,

     v.

SUNTRUST BANKS, INC.,

        Defendant – Appellee,

     and

THEODORE L. CHANDLER, JR.; CHRISTINE R. VLAHCEVIC; G. WILLIAM EVANS; RONALD B. RAMOS; DEVON M. JONES; STEPHEN CONNER,

        Defendants.

─────────────

**No. 11-1707**

─────────────

ANGELA M. ARTHUR, as Trustee of the Arthur Declaration of Trust, dated December 29, 1988, and all similarly situated; VIVIAN R. HAYS, an individual, and all others similarly situated; LEAPIN EAGLE LLC, a limited liability company, and all others similarly situated; DENISE J. WILSON, an individual, and all others similarly situated,

        Plaintiffs – Appellants,

     v.

SUNTRUST BANKS, INC., a Georgia corporation,

                Defendant – Appellee,

     and

G. WILLIAM EVANS, an individual; STEPHEN CONNOR, an individual,

                Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Anderson. Joseph F. Anderson, Jr., District Judge. (8:09-cv-00415-JFA; 8:09-cv-01739-JFA)

---

Argued: May 17, 2012            Decided: July 2, 2012

---

Before AGEE, DAVIS, and WYNN, Circuit Judges.

---

Affirmed by unpublished opinion. Judge Davis wrote the opinion, in which Judge Agee and Judge Wynn joined.

---

**ARGUED:** Thomas G. Foley, Jr., FOLEY BEZEK BEHLE & CURTIS, LLP, Santa Barbara, California, for Appellants. Cory Hohnbaum, KING & SPALDING, LLP, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Cheryl F. Perkins, WHETSTONE MYERS PERKINS & FULDA, LLC, Columbia, South Carolina, James R. Gilreath, GILREATH LAW FIRM, Greenville, South Carolina, for Appellants Gerald R. Terry, Ann T. Robbins, Jane Evans; Robert L. Brace, HOLLISTER AND BRACE, Santa Barbara, California, for Appellants Angela M. Arthur, Vivian R. Hays, Leapin Eagle LLC, Denise J. Wilson.

---

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

In these diversity actions, consolidated for pre-trial proceedings in the District of South Carolina by the Judicial Panel on Multi-District Litigation ("JPML"), the district court dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) all claims against Appellee SunTrust Banks, Inc. ("SunTrust").[1] The principal question presented is whether LandAmerica 1031 Exchange Services, Inc. ("LES"), which (before it filed a petition in bankruptcy) acted as a "qualified intermediary" ("QI") in the exchange of investment properties pursuant to 26 U.S.C. § 1031(a)(1), assumed fiduciary duties with respect to the proceeds of the sale of the relinquished properties. Appellants ("the Exchangers") are the named representatives of putative classes consisting of approximately 400 members that engaged LES as a QI between February and

---

[1] The Exchangers brought other claims that are not at issue in this appeal, including claims against several individual officers and directors of LES and its corporate parent, LandAmerica Financial Group, Inc. ("LFG"). The individual defendants, the claims against whom have been and remain stayed, are Theodore L. Chandler, Jr. (Chairman and Chief Executive Officer of LFG), Stephen Conner (Senior Vice President of LES and LFG), G. William Evans (Executive Vice President and Chief Financial Officer of LFG, director and officer of LES), Ronald B. Ramos (Vice President and Treasurer of LES and Senior Vice President and Treasurer of LFG), and Devon M. Jones (Vice President and Assistant Treasurer of LES and LFG). Among the claims against the individual defendants are allegations of fraud, discussed infra at 27-38.

November 2008. The district court ruled LES did not assume fiduciary duties; thus SunTrust -- which had held LES's general operating account, sold LES certain securities, and extended LES a line of credit -- could not be liable for aiding and abetting the breach of a fiduciary duty by LES. The district court also dismissed the Exchangers' claim of civil conspiracy. We affirm.

I.

First, we address the claim of aiding and abetting breach of fiduciary duties. We review a district court's dismissal pursuant to Rule 12(b)(6) de novo. Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009). We assume all well-pled facts are true, and draw all reasonable inferences in favor of the plaintiff. Id. The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

We begin with an explanation of the statutory and regulatory framework out of which this dispute arose. We then

summarize the district court's rulings. Finally, we explain why we discern no error by the district court.

A.

Ordinarily, if a person owns real property for business or investment purposes that has risen in value over time (i.e., has a low adjusted basis and a high fair market value), the property owner incurs capital gains taxes upon selling the property. In some circumstances, however, a property owner may defer the recognition of capital gains if the property is "held for productive use in a trade or business or for investment" and if the owner "exchange[s]" the property (known as "relinquished property") for another property "of like kind" (known as "replacement property"). 26 U.S.C. § 1031(a)(1). The property owner must identify replacement property "of like kind" within 45 days of the sale of the original property, and must close on the new property within 180 days of the original sale. Moreover, the property owner must not actually or constructively receive the proceeds of the sale of the first property. 26 C.F.R. § 1.1031(k)–1(f)(2). The Internal Revenue Service has defined four "safe harbors" available to ensure a determination of non-receipt: a "qualified escrow account," a "qualified trust," a "qualified intermediary," or certain security or guarantee arrangements. See id. § 1.1031(k)–1(g).

5

B.

The Exchangers chose the qualified intermediary option, and engaged LES as a QI between February and November 2008. As IRS regulations require, LES's role was to "acquire[] the relinquished property from the taxpayer, transfer[] the relinquished property, acquire[] the replacement property, and transfer[] the replacement property to the taxpayer." Id. § 1.1031(k)-1(g)(4)(iii)(B). The Exchangers all executed the same Exchange Agreement, which, among other things, enumerated the parties' rights with respect to the "Exchange Funds" -- the proceeds LES would receive upon selling the relinquished property, decreased by remaining debts on the property, real estate commissions, closing costs, and other expenses.[2]

As for the Exchange Funds, LES agreed in § 2(a) of the Agreement to "hold" them and "apply" them toward the purchase of replacement properties. LES also agreed in § 3(a) to "deposit" the funds in an account at SunTrust and to "unconditionally guarantee the return and availability of the Exchange Funds" as well as certain rates of "guaranteed interest." The Exchangers, for their part, agreed in § 2(c) that LES would have "sole and exclusive possession, dominion, control and use of all Exchange

---

[2] A sample Exchange Agreement is at J.A. 822-32. All citations to sections of the agreement are to that sample agreement.

Funds" during the course of the exchange, and that the Exchangers would have "no right, title, or interest in or to the Exchange Funds or any earnings thereon," as well as "no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of [the] Exchange Funds," other than the right to receive any remaining balance of the Exchange Funds after LES purchased replacement property. The Exchangers also acknowledged that LES would "invest[]" the Exchange Funds, and that "the amount of the Exchange Funds may be in excess of the maximum amount of deposit insurance carried by [SunTrust]." As compensation for LES's services, the Exchangers agreed to pay fees of approximately $750 to $1,000 per exchange.

The Agreement also provided the following:

- Section 6(b) recites that LES was "entering into this Exchange Agreement solely for the purpose of facilitating taxpayers' exchange" (emphasis and capitalization omitted);

- Section 6(c) limits LES's duties to those "expressly set forth herein," and provides that "no additional duties or obligations shall be implied hereunder or by operation of law or otherwise";

- Section 11, an integration clause, provides: "This Exchange Agreement contains the entire understanding between and among the parties hereto."

7

LES abided by its contractual obligation to sell the Exchangers' relinquished property, and received the net proceeds. LES deposited the Exchange Funds in its general operating account, a money market account at a SunTrust bank in Virginia (the "3318 account"). LES failed, however, to complete the exchanges.

Prior to agreeing to serve as the Exchangers' QI, LES had used other property owners' exchange funds in part to buy hundreds of millions of dollars of auction rate securities ("ARS"). ARS are long-term variable-rate debt securities with interest rates or dividends that are reset at frequent intervals. Most of the ARS held by LES had been sold to LES by SunTrust Robinson Humphrey, Inc. ("STRH"), a SunTrust-related entity. In February 2008, the auctions through which ARS interest rates were set began to fail, and the ARS market froze. LES held ARS with a par value of $290.5 million, but the frozen market left those securities with a liquidation value of only a small percentage of par. With those assets frozen, LES's liquid assets were insufficient to acquire replacement properties for the property owners under existing exchange agreements. While LES eventually declared bankruptcy, it did not do so immediately. Rather, apparently hoping the ARS market would normalize, LES continued to enter into new exchange agreements, including those with the Exchangers, allegedly using new

8

exchange funds to cover old exchanges as they came due -- an arrangement the Exchangers call a Ponzi scheme.

C.

LES filed for Chapter 11 bankruptcy on November 26, 2008. One of the issues before the bankruptcy court was whether the Exchange Funds (a) became the property of LES when they were received in the SunTrust account, in which case the Exchangers would be limited to a pro rata share of the assets in LES's bankruptcy estate, or (b) remained the property of the Exchangers, in which case the Exchangers would be entitled to preferential recovery of those funds. As explained in detail below, the Bankruptcy Court concluded the Exchange Funds became LES's property, and therefore were subject to pro rata distribution in bankruptcy. Frontier Pepper's Ferry, LLC v. LandAmerica 1031 Exch. Serv. (In re LandAmerica Fin. Group Inc.), No. 08-35994, 2009 WL 1269578 (Bankr. E.D. Va. May 7, 2009); see also Millard Refrigerated Servs., Inc. v. Landamerica 1031 Exhange Servs. (In re LandAmerica Financial Group, Inc.), 412 B.R. 800, 815 (Bankr. E.D. Va. 2009) (reaching the same conclusion with respect to a minority of the property owners whose funds were held in segregated rather than commingled accounts at SunTrust).

After that issue was resolved in favor of LES's trustee, the trustee ratably distributed LES's remaining assets among

9

LES's creditors, including the Exchangers. The Exchangers recovered only a portion of the Exchange Funds from LES in that process. They then turned their attention to SunTrust (among others, see supra n.1), for the role it allegedly played in the loss of the Exchange Funds.

The Arthur plaintiffs filed suit in the Southern District of California and the Terry plaintiffs filed suit in South Carolina state court. The Terry action was removed to federal court and the JPML consolidated the cases in the District of South Carolina for pretrial proceedings and discovery. After the district court dismissed certain claims against SunTrust in a consolidated amended complaint, for failure to plausibly allege that SunTrust knew about "LES's [a]ctivities," In re § 1031 Exchange Litigation, 716 F. Supp. 2d 415, 428 (D.S.C. 2010) ("Terry I"), the plaintiffs filed a second amended complaint ("SAC") on October 6, 2010.

In the SAC, the Exchangers asserted three claims against SunTrust, two of which are at issue on appeal: aiding and abetting LES's breach of fiduciary duty, and civil conspiracy.[3] In their aiding-and-abetting claim against SunTrust, the Exchangers allege that LES owed fiduciary duties to the

---

[3] We address the conspiracy claim infra at 27-38. The SAC also alleged conversion and aiding and abetting conversion; the Exchangers have not appealed the dismissal of those claims.

10

Exchangers and that SunTrust knowingly "assisted LES in breaching its fiduciary duties to Exchangers." (SAC ¶5.)[4] They allege that SunTrust not only knew that LES's assets were tied up in the frozen ARS market, but also that "neither [LES's parent] LFG nor LES had a rolling source of liquid assets to fund exchanges other than the daily influx of new Exchange Funds." (SAC ¶12.) SunTrust and LES, they allege, "plan[ned] . . . to conceal the scheme from new Exchangers" until LES somehow came up with money to plug the gap in its balance sheet. (SAC ¶18.) The plaintiffs further allege SunTrust aided and abetted LES's actions because it had a financial incentive to do so: Not only did SunTrust hold LES's operating account; it also had sold ARS to LES through STRH and had extended LES a $200 million revolving line of credit. SunTrust, they allege, hoped that by helping LES operate its alleged Ponzi scheme, LES would be more likely able to repay a portion of the $100 million outstanding on the line of credit.

The Exchangers also allege that SunTrust committed common law civil conspiracy. They allege that certain agents or representatives of SunTrust, including its Deputy General

_____

[4] The SAC and attached exhibits appear at pages 743-1160 in the Joint Appendix, and at ECF No. 130 on the district court's docket. We will refer to the Exchangers' allegations by the numbered paragraphs in the SAC where they appear.

11

Counsel and Senior Vice President Brian Edwards, and representatives Samuel Ballesteros, Kris Anderson, Bill Mayfield, Linda Burras and Sheridan Reese, "engaged in concerted action" with the individual defendants (Allen, Ramos, Conner, Jones and Chandler) "for the united purpose" of (1) breaching LES's fiduciary duties to the Exchangers, and (2) "defrauding the Exchangers out of their Exchange Funds." (SAC ¶209.)

The district court dismissed the aiding-and-abetting claim primarily because it concluded LES did not owe the Exchangers a fiduciary duty. See In re IRS § 1031 Exchange Litigation, MDL No. 8:09-mn-2054-JFA, 2011 WL 2444805 (D.S.C. June 15, 2011) ("Terry II"). It also dismissed the conspiracy claim. See Terry I, 716 F. Supp. 2d at 427-28 (dismissing without prejudice the conspiracy claim in the first amended complaint); Terry II, 2011 WL 2444805, at *6 (dismissing the conspiracy claim in the second amended complaint). The Exchangers timely appealed.

D.

The principal question presented in this appeal is the legal issue of whether LES plausibly owed a fiduciary duty to the Exchangers. The Exchangers offer three alternative theories for why the Agreement created a fiduciary relationship between themselves and LES: (1) the Exchange Funds were held by LES in trust; (2) LES was the Exchangers' agent; and/or (3) LES served as a real estate broker. As evidence of LES's alleged fiduciary

12

status, they point to language in the Agreement, particularly LES's commitment to "hold" the exchange funds and "apply" them toward the purchase of replacement properties, as well as evidence of trade usage and extrinsic evidence of the parties' intent. We are not persuaded by any of those theories that reversal is warranted.

1.

(a)

The Exchangers first argue LES was a fiduciary because the Agreement created either an express or resulting trust, with LES as the trustee.[5] An express trust is created when the parties "affirmatively manifest an intention that certain property be held in trust for the benefit of a third party." In re Dameron, 155 F.3d 718, 722 (4th Cir. 1998). A resulting trust is "an indirect trust that arises from the parties' intent or from the nature of the transaction and does not require an express declaration of trust." 1924 Leonard Rd., LLC v. Roekel, 636 S.E.2d 378, 383 (Va. 2006). When a trust has been created, the beneficiary remains the "equitable owner of the trust property." In re Dameron, 155 F.3d at 722 (quoting Broaddus v. Gresham, 26

---

[5] The parties agree that Virginia law governs the question whether LES was a fiduciary. The district court below considered whether to certify the question of LES's fiduciary status to the Virginia Supreme Court or the California Supreme Court. All parties opposed certification.

13

S.E.2d 33, 35 (Va. 1943)).[6] The Exchangers argue that under the Agreement they "reserved an equitable interest in their exchange proceeds" and limited LES's role to "hold[ing]" those funds and applying them toward the purchase of replacement property; therefore, they argue, LES held the funds in trust.[7] They rely on three categories of evidence to show that LES held the funds in trust: (1) the language of the Agreement; (2) custom and usage in the QI industry; and (3) extrinsic evidence of the parties' intent.

As for the language of the Agreement, the Exchangers point to four terms or phrases:

(1) LES's obligation was to "hold" the funds and "apply" them toward replacement properties, see § 2(a) ("to hold and apply the Exchange Funds in accordance with the terms and conditions of [the] Exchange Agreement."); § 2(c) (referring to the funds "held by LES").

(2) § 3(a) provides that LES "will deposit the Exchange Funds" in a SunTrust account, and discloses that "the amount of the Exchange Funds may be in excess of the

---

[6] Virginia law also recognizes constructive trusts, which arise "by operation of law, independently of the intention of the parties," In re Dameron, 155 F.3d at 722. The Exchangers do not argue a constructive trust was formed; their argument is that the parties intended to create a trust.

[7] Although the Exchangers do not specify whether they believe an express or resulting trust was formed, in these circumstances the question presented is the same regardless: whether the Agreement and the surrounding circumstances reveal the parties' intent that LES would hold the Exchange Funds in trust for the benefit of the Exchangers.

14

maximum amount of deposit insurance carried by the depository institution [i.e., SunTrust]."

(3)  In § 3(a) LES "unconditionally guarantee[d] the return and availability of the Exchange Funds."

(4)  § 6(b) limits LES's role to one "solely for the purpose of facilitating taxpayers' exchange."

These terms are evidence of LES's trustee status, the Exchangers argue, because they "direct[] that the Funds be used and applied" for a specific purpose, Appellant's Reply Br. at 18, and belie a conclusion that LES "received full ownership of the exchange funds with the right to spend the funds however it chose." Appellants' Br. at 41.

The Exchangers also point to industry custom and usage. They argue that the QI industry "promotes, through marketing materials and its industry trade group, the recognition that qualified intermediaries are fiduciaries owing fiduciary duties to protect and preserve the monies they handle." Appellant's Br. at 52. For example, the Code of Ethics and Conduct of the Federation of Exchange Accommodators, the national trade group for qualified intermediaries, provides that exchange accommodators such as LES "shall have the responsibility to act as custodian for all exchange funds," "shall invest exchange funds in investments which meet the 'Prudent Investor Standard,'" shall not "knowingly commingle[]" exchange funds with operating accounts, and shall not invest exchange funds "in

15

a manner that does not provide sufficient liquidity to meet the Exchange Accommodator's contractual obligations to its clients and does not preserve the principal of the exchange funds." J.A. 95.

Finally, although they concede that some provisions run contrary to their interpretation, the Exchangers argue that at most those provisions render the Agreement ambiguous; given the ambiguity we may rely on extrinsic evidence, which, they argue, shows that the parties considered LES a trustee. For example, LES's website described Exchange Funds as "Held in Trust," (SAC ¶161); an "Executive Summary" that LES provided to SunTrust stated that LES "serves in a fiduciary capacity" for its customers (SAC ¶6; J.A. 846); LFG's 10-K referred to Exchange Funds as "the customer's funds," which "are held by us for the benefit of our customers and are therefore not included as our assets" (SAC ¶9); minutes of an October 1, 2008, LFG Investment Funds meeting stated that "the company is acting in a fiduciary capacity, with the funds ultimately belonging to the retail client" (SAC ¶139); and an October 6, 2008, letter from LFG to the Nebraska Department of Insurance, which described LES's exchange agreements as "a specialized form of escrow." (SAC ¶140; J.A. 1137.) In addition, in an October 7, 2008, letter to SunTrust, LFG's general counsel stated that LES "holds [Exchange Funds] in escrow as a fiduciary," and invests them "on behalf of

its customers," "until the funds (with the related earnings) are returned to customers to complete the 1031 exchange." (SAC ¶94; J.A. 1056.)

The district court rejected these arguments, as had the bankruptcy court that oversaw the LES bankruptcy, where, as here, the Exchangers argued that they retained an "equitable interest in the ownership of the Exchange Funds" and accordingly LES's rights to the funds were limited to those of a trustee. The courts reasoned, to the contrary, that by entering the Agreement the Exchangers "relinquished any and all interests in the [Exchange Funds], including the equitable interest that a beneficiary of a trust would retain in trust property," an action that is "inconsistent with the establishment of a trust." Frontier Pepper's Ferry, 2009 WL 1269578, at *9; see also Terry II, 2011 WL 2444805, at *4 ("[F]or those reasons expressed by the bankruptcy court in Frontier Pepper's Ferry, . . . the court finds that Virginia law would not impose a fiduciary relationship between LES and the Plaintiffs under the facts of this case through either an express or resulting trust.").

(b)

Under Virginia law, a contract "must be construed as a whole to determine the parties' intent with respect to specific provisions." Westmoreland-LG&E Partners v. Virginia Elec. & Power Co., 486 S.E.2d 289, 294 (Va. 1997). If a contract is

17

"complete, unambiguous, and unconditional," evidence of prior or contemporaneous oral negotiations is "generally inadmissible to alter, contradict, or explain the terms" of the contract. Id. Whether a contract is ambiguous depends on whether its language "admits of being understood in more than one way," id., that is, whether "its parts can be read together without conflict," Doswell Ltd. P'Ship v. Virginia Elec. & Power Co., 468 S.E.2d 84, 88 (Va. 1996). If a contract's "parts can be read together without conflict," a court "must construe the language as written." Id.

Unlike such parol evidence, "[e]vidence that contract phrases or terms have acquired, by custom in the locality, or by usage of the trade, a peculiar meaning not attached to them in their ordinary use is admissible even though the phrases or terms themselves are unambiguous." Doswell, 468 S.E.2d at 90. Such evidence of "usage of trade" is admissible to "ascertain[] the meaning of the parties' agreement," "give particular meaning to specific terms of the agreement," and/or "supplement or qualify the terms of the agreement," Va. Code Ann. § 8.1A-303(d), so long as "the usage in question operated upon the minds of the parties in using the language which was employed in the contract." Westmoreland, 486 S.E.2d at 293.

Thus, the question presented is whether the language of the Agreement, as "supplement[ed] or qualif[ied]" by relevant

18

evidence of trade usage, Va. Code Ann. § 8.1A-303(d), unambiguously excludes any interpretation that LES assumed the fiduciary duties of a trustee. We conclude it does.

First, the bankruptcy court correctly observed, "not only is there an absence of any language that the parties intended to create a trust"; the language above "actually evidences an intent <u>not</u> to do so." <u>Frontier Pepper's Ferry</u>, 2009 WL 1269578, at *9 (emphasis in original). The Exchangers expressly granted to LES "sole and exclusive possession, dominion, control and use of all Exchange Funds" during the course of the exchange. They disclaimed any "right, title, or interest in or to the Exchange Funds or any earnings thereon." They also disclaimed any "right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of [the] Exchange Funds," other than the right to receive any remaining balance of the Exchange Funds after LES purchased replacement property. The Agreement disclaimed all duties other than those "expressly set forth herein," and provided that "no additional duties or obligations shall be implied hereunder or by operation of law or otherwise" (§ 6(c)). The Agreement also stated that it "contain[ed] the entire understanding between and among the parties hereto" (§ 11). For these reasons, the Agreement unambiguously did not create a trust.

The aspects of the Agreement the Exchangers focus on do not render the Agreement ambiguous. LES's obligation to "hold" and "apply" the funds toward replacement properties is equally susceptible to interpretations that LES was or was not a fiduciary; the unavoidable impact of the provisions quoted above, however, is that the parties did not intend to create a trust. Moreover, although § 2(c) does not specifically disclaim fiduciary duties, that absence is far from dispositive, because it is the meaning of the Agreement as a whole, not § 2 in particular, that controls whether LES was a trustee. Finally, we recognize that LES's assumption of "purely contractual" duties, Appellee's Br. at 25, does not necessarily mean that LES was not a trustee; it is the nature of the duties LES assumed in the Agreement that determines whether LES was a fiduciary. See Frank H. Easterbrook & Daniel R. Fischel, Contract and Fiduciary Duty, 36 J.L. & Econ. 425, 446 (1993) ("Contract and fiduciary duty lie on a continuum best understood as using a single, although singularly complex, algorithm."); see also Victor Brudney, Contract and Fiduciary Duty in Corporate Law, 38 B.C. L. Rev. 595 (1997) (discussing the overlap between contractual duties and fiduciary duties). Nonetheless, our reading of the Agreement is the same as that of the bankruptcy and district courts. The Agreement unambiguously precludes a finding that LES held the Exchange Funds in trust.

The evidence of trade usage proffered by the Exchangers also does not alter this conclusion. According to the Exchangers, they may not have been <u>required</u> to grant LES "sole and exclusive possession, dominion, control and use of all Exchange Funds." Other exchange accommodators apparently do not require that exchangers grant QIs such a replete bundle of rights to the proceeds of the sale of relinquished property. <u>Cf. In re Exchanged Titles</u>, 159 B.R. 303, 305 (Bankr. C.D. Cal. 1993) (finding that a different exchange agreement by a different accommodator was "ambiguous" as to "whether the parties intended to transfer both legal and equitable rights" to the relinquished property or rather legal title only). But it is LES's Exchange Agreement, not that of other QIs, that we must consider, and that Agreement unambiguously did not render LES a trustee.

Finally, we note that the Exchangers, in electing to rely on a safe harbor under § 1031, were not required to use a qualified intermediary. As mentioned above, the Treasury regulations allow exchangers to use, among other things, a "qualified escrow" or a "qualified trust." As the bankruptcy judge explained in one of the related adversary proceedings:

> Instead of using either of these available options, the parties chose the "qualified intermediary" safe harbor. . . . The parties did not in addition separately satisfy the terms and conditions of the Treasury Regulations for the creation of either a

21

> qualified escrow or a qualified trust. . . . [T]he parties' decision to eschew the escrow and trust provisions of the tax code in favor of a different safe harbor evidences that there was no intention to create a trust relationship.

Millard Refrigerated Servs., 412 B.R. at 815. This reasoning is sound.

In sum, we hold that the parties' Exchange Agreement unambiguously did not render LES a trustee with respect to the Exchange Funds. Accordingly, and because the Agreement is "complete" and "unconditional," Virginia law precludes our consideration of extrinsic evidence of the parties' intent.

### 2.

The Exchangers next argue that LES was "acting as an agent on behalf of the Property Owners to consummate these exchange transactions." Appellant's Br. at 35. An agency relationship arises under Virginia law when one person manifests consent to another "that the other shall act on his behalf and subject to his control." Murphy v. Holiday Inns, Inc., 219 S.E.2d 874, 876 (Va. 1975) (quoting Restatement (Second) of Agency § 1 (1958)). When a principal-agent relationship exists, the agent is obligated "to interpret the principal's statement of authority, as well as any interim instructions received from the principal, in a reasonable manner to further purposes of the principal that the agent knows or should know, in light of facts that the agent knows or should know at the time of acting." Restatement (Third)

22

of Agency § 1.01 cmt. e. Virginia characterizes such duties as those of a fiduciary. See Banks v. Mario Indus., 650 S.E.2d 687, 695 (Va. 2007) ("[O]nce an agency relationship was established, [the agents] necessarily owed a fiduciary duty to [the principal].”). "It is open to question,” however, "whether an agent's unconflicted exercise of discretion as to how to best carry out the agent's undertaking implicates fiduciary doctrines.” Restatement (Third) of Agency § 1.01 cmt. e.

As evidence that LES was the Exchangers' agent, the Exchangers argue LES "was subject to [their] direction” in various ways, such as identifying the replacement property and the buyer of the relinquished property, as well as setting the purchase price. Appellant's Br. at 60-61. Moreover, the Treasury Regulation governing QIs characterizes a QI as acquiring and transferring relinquished properties "either on its own behalf or as the agent” of a party to the transaction, 26 C.F.R. § 1.1031(k)-1(g)(4)(iv)(B); because LES "explicitly did not contract on its own behalf,” the Exchangers argue, it must have been their "agent.” Appellant's Reply Br. at 16. Finally, they argue, the safe-harbor regulation states that for purposes of determining whether a taxpayer received property (and thereby whether the taxpayer is eligible for § 1031 treatment), the QI is treated "as if [it] is not the agent of the taxpayer.” 26 C.F.R. § 1.1031(k)-1(g)(4) (emphasis added). This language, the

23

Exchangers argue, implies that LES was their agent "for all other purposes." Appellant's Br. at 62. Finally, they argue, under Virginia law "an agency relationship is not one that can be disclaimed." Appellant's Reply Br. at 19 (citing Murphy, 219 S.E.2d at 875).

In response, SunTrust argues that although "LES was contractually obligated to facilitate Appellants' purchase of replacement property," the nature and extent of that obligation did not render LES the Exchangers' agent. Appellee's Br. at 42. We agree. In a wide variety of contexts, parties execute contracts, like the Agreement here, that allow one party to direct another to perform certain actions. Such obligations do not automatically create fiduciary relationships. Only those where the agent assents to act "on the principal's behalf and subject to the principal's control" does a fiduciary relationship arise. Cf. Restatement (Third) of Agency § 1.01. As explained above, the Exchangers granted LES "sole and exclusive" possession and use of the Exchange Funds, and disclaimed any "right, title, or interest in or to the Exchange Funds." In light of these provisions, LES cannot be said to have been acting on the Exchangers' behalf and subject to their control. Finally, although the Treasury Regulations do not prohibit a QI from being an agent of its customer, and treat a QI "as if" it were not the Exchangers' agent, nothing in those regulations

24

requires that result either. The language of the Agreement controls, and that language is inconsistent with LES having become a fiduciary under agency law.

3.

The Exchangers' third argument is that LES was a real estate broker, and thereby owed them fiduciary duties. Virginia law defines "real estate broker" as a person or entity "who, for compensation or valuable consideration,"

> (i) sells or offers for sale, buys or offers to buy, or negotiates the purchase or sale or exchange of real estate . . . , or

> (ii) leases or offers to lease, or rents or offers for rent, any real estate or the improvements thereon for others.

Va. Code Ann. § 54.1-2100. The statute expressly excludes from the definition the following: attorneys acting in the performance of their duties; trustees, administrators or executors; auctioneers; property management companies; and owners or lessors of property acting "in the regular course of or incident to the management of the property and the investment therein." Id. § 54.1-2103. Real estate brokers are subject to what the Exchangers call "statutory fiduciary duties," Appellants' Br. at 36, namely that they (1) must "[a]ccount in a timely manner for all money and property received by the licensee in which the seller has or may have an interest," Va. Code Ann. § 54.1-2131(A)(5), (2) must disclose all material

25

facts known to the broker, id. § 54.1-2131(A)(6), and (3) must not "divert or misuse any funds held in escrow or otherwise held by him for another," id. § 54.1-2108.

The Exchangers argue LES was a real estate broker because LES received compensation for its role as an exchange accommodator, which involved selling relinquished properties and buying replacement properties, and QIs are not expressly exempt from the statutory definition of real estate brokers. We disagree. Simply put, we believe the Virginia legislature would not have intended QIs like LES to be considered real estate brokers. QIs exist as a mechanism for qualifying taxpayers to defer the recognition of gains on investment properties. They serve a different, more specialized function than do real estate brokers as the term is commonly understood. Moreover, and importantly, the Exchangers agreed to limit LES's duties to those "expressly set forth" in the Agreement, and LES is more analogous to the entities listed among the exceptions than to real estate brokers. For these reasons, we hold as a matter of law that LES was not, and may not be treated as, a real estate broker under Virginia law.[8]

---

[8] SunTrust argues in the alternative that, even if the Agreement rendered LES a real estate broker under Virginia law, LES disclaimed any corresponding duties imposed by virtue of that status. The Exchangers argue to the extent there was such a disclaimer, it should be "void as a matter of public policy." (Continued)

26

For the foregoing reasons, read as a whole, the Agreements did not impose fiduciary duties on LES, and therefore the district court properly dismissed the claim seeking to hold SunTrust liable for aiding and abetting LES's alleged breach of fiduciary duty.[9]

## II.

We now turn to the Exchangers' claim alleging common law civil conspiracy, judging the sufficiency of the SAC by the same standard. See supra at 4. Under Virginia common law, "[a] civil conspiracy is [1] a combination of two or more persons, [2] by some concerted action, [3] to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." Hechler Chevrolet, Inc. v. Gen. Motors Corp., 337 S.E.2d 744, 748 (Va.

---

Appellants' Reply Br. at 22-23 (citing Fairfax Gas & Supply Co. v. Hadary, 151 F.2d 939, 940 (4th Cir. 1945); All Bus. Solutions, Inc. v. NationsLine, Inc., 629 F. Supp. 2d 553, 560 (W.D. Va. 2009)). Because we conclude LES was not a real estate broker under Virginia law, we need not resolve this issue.

[9] Because we conclude LES was not a fiduciary under Virginia law, we need not resolve SunTrust's alternative argument that Virginia does not recognize a cause of action of aiding and abetting a tort.

27

1985).[10] The "unlawful act" element requires that a member of the alleged conspiracy have "committed" an "underlying tort," Almy v. Grisham, 639 S.E.2d 182, 188 (Va. 2007), such as inducing a breach of contract, Catercorp, Inc. v. Catering Concepts, Inc., 431 S.E.2d 277, 281 (Va. 1993). Further, a claim for civil conspiracy requires that the alleged conspirators' unlawful act have caused damages; a plaintiff may not recover for "the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means." Id. at 282.

California law, which the district court concluded applies to the Arthur plaintiffs' conspiracy claim, see Terry I, 2011 WL 2444805, at *3, treats allegations of civil conspiracy in much the same way as does Virginia law, although it considers conspiracy to be "not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454,

---

[10] Virginia also has statutory tort of "Combination[] to injure others in their reputation, trade, business or profession," Va. Code Ann. § 18.2-499, which principally prohibits two or more persons from combining to "willfully and maliciously injur[e] another in his reputation, trade, business or profession." Id. That statute is not at issue, because the Exchangers allege only a conspiracy under Virginia common law, not a violation of § 18.2-499.

28

457 (Cal. 1994). "By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy." Id. "In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." Id. Like Virginia law, California law requires that "a conspiracy . . . be activated by the commission of an actual tort," and that the "civil wrong" have "result[ed] in damage." Id. A plaintiff alleging conspiracy "must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it." Choate v. County of Orange, 103 Cal. Rptr. 2d 339, 353 (Cal. Ct. App. 2000).

We discern no conflict between Virginia and California law on the elements of a properly pled civil conspiracy claim as applied to the facts here, and the parties have not pointed to one. Thus, we need not resolve this choice-of-law question, and we proceed to explain why the Exchangers have failed to state a claim for civil conspiracy under either Virginia or California law.

As noted, the Exchangers' complaint, fairly read, alleges two underlying torts: breach of fiduciary duty and fraud.[11] To the extent the alleged underlying tort was LES's breach of fiduciary duty, the district court dismissed the conspiracy claim upon concluding that LES was not a fiduciary. See Terry II, 2011 WL 2444805, at *6. We agree that, because LES did not owe the Exchangers a fiduciary duty, that theory of the Exchangers' conspiracy claim did not allege an "unlawful act," and thus was properly dismissed.

As to the Exchangers' conspiracy-to-defraud theory, they allege that SunTrust engaged in concerted action with LES's officers to conceal LES's imminent collapse from the Exchangers, with the common purpose of deceiving the Exchangers into entering Exchange Agreements that they otherwise would not have entered. The district court concluded that the complaint "does not contain sufficient factual matter to move the Customers' conspiracy claim from the conceivable to the plausible." Terry I, 716 F. Supp. 2d at 428.[12] That is also the basis on which

_____

[11] The conspiracy count also alleges that an object of the conspiracy was to "operate an unlawful Ponzi scheme." J.A. 812. Because the "unlawful act" element requires an allegation of an underlying tort, we read this as a further allegation of either a breach of fiduciary duty or fraud.

[12] The district court reached that conclusion upon dismissing the Exchangers' first amended complaint, before they filed the second amended complaint. Because upon dismissing the (Continued)

30

SunTrust argues we should affirm the dismissal of the fraud component of the Exchangers' conspiracy claim. See Appellee's Br. at 49-50 (arguing the claim was properly dismissed because the Exchangers "failed to plead anything beyond conclusory allegations of the existence of the conspiracy" and "failed to adequately allege the existence of an underlying tort").

Because this component of the Exchangers' conspiracy claim alleges fraud, the Exchangers' complaint must comply not only with Rule 12(b)(6) but also with Federal Rule of Civil Procedure 9(b), which requires that plaintiffs alleging fraud plead "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The "circumstances" that must be pled with particularity are "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure: Civil § 1297, at 590 (2d ed. 1990)). The defendant's "knowledge as to the true facts" and

latter the district court stated that it "maintain[ed] its previous finding" that the Exchangers had failed to sufficiently plead a civil conspiracy cause of action, Terry II, 2011 WL 2444805, at *6, we assume the court's rationale for dismissing the fraud component of the conspiracy claim was that the factual allegations were insufficient.

"intent to deceive" may be pled "generally," Fed. R. Civ. P. 9(b), but a complaint must nonetheless "show[]," that the defendants' knowledge and/or intent, where relevant, plausibly entitles the plaintiff to relief. Fed. Rule Civ. P. 8(a)(2); Iqbal, 556 U.S. at 678, 686-87. Upon reviewing the factual allegations in the Exchangers' complaint and the attached exhibits, we agree that the Exchangers have not shown that their factual allegations "plausibly give rise to an entitlement to relief" for conspiracy. Iqbal, 556 U.S. at 679.

The second amended complaint alleges that by mid-2008, LES and its officers knew LES was insolvent, as nearly all of its assets were tied up in frozen ARS, leaving just $28 million to cover pending exchanges of over $290 million, and by early November 2008, LES and LFG were preparing to declare bankruptcy. (SAC ¶118.) Throughout this time, the Exchangers allege, the individual defendants, along with LES, LFG and SunTrust, had "actual knowledge of material adverse facts that any and all potential Exchange clients would irrefutably consider material," including that LES's "financial status" was "dire" and "that LES was operating a Ponzi scheme and applying their Funds to prior obligations." (SAC ¶221.)

Despite this knowledge, the Exchangers allege, and "with intent to deceive so that the Exchange Clients continued to deposit Funds with LES," the individual defendants intentionally

32

breached their duty "to disclose to the Exchange Clients all material facts concerning the Exchange transactions." (SAC ¶222.) Moreover, as part of the fraudulent scheme, they allege, two of the individual defendants, Ronald Ramos and Devon Jones, arranged for LFG to transfer funds from LFG as "lulling payments." (SAC ¶145.) These payments, which temporarily allowed LES to continue meeting some prior exchange obligations, further served to fraudulently conceal LES's "insolvency and imminent failure . . . from prospective Exchange clients whose Funds were needed to keep LES going in the short term." (Id.) Thus, the Exchangers allege, by intentionally failing to disclose to the Exchangers that, if the ARS market were to remain frozen, LES would be unable to comply with its obligation to purchase the Exchangers' replacement properties, the individual defendants committed fraud.

Those factual allegations, which must be taken as true at this stage, satisfy the "unlawful act" element of a conspiracy claim under Virginia or California law. The Exchangers also clearly and plausibly allege that they were harmed by the failure of LES and the individual defendants to disclose the above facts. The remaining question is whether the Exchangers have plausibly and non-conclusorily alleged that SunTrust "combin[ed]" with LES to engage in "concerted action" to commit that fraud, as required by Virginia law, see Hechler Chevrolet,

33

337 S.E.2d at 748, and "acted in concert and came to a mutual understanding" with the individual defendants "to accomplish a common and unlawful plan," as required by California law, see Choate, 103 Cal. Rptr. 2d at 353. For the following reasons, we conclude the Exchangers' allegations are insufficient.

The Exchangers do plausibly allege that, at least by October 2008 and probably before, SunTrust representatives, including Brian Edwards (its Deputy General Counsel and Senior Vice President), were aware that LES was facing "severe liquidity problems that threatened its continued viability" and that LES was using Exchange Funds "to pay prior commitments on older Exchange Transactions." (SAC ¶94.) Indeed, LES provided detailed disclosures directly to SunTrust, in part because LES was "imploring SunTrust for financial assistance which necessarily included disclosing to SunTrust all of the financial constraints both LFG and LES were operating under." (SAC ¶111.) For example, LES provided to SunTrust the "Executive Summary" described above, which disclosed to SunTrust that "the credit crisis caused a portion ($290.5 [million]) of the underlying, liquid investments of our exchange customers to become illiquid at a time when we were holding approximately $700 million of client funds." J.A. 847. The document also explained that "during the height of the credit crisis, outflows exceeded inflows by nearly $400 million," and that although LES

34

"expect[s] the balance in the investment portfolio to be under less pressure," "it is likely that during the 4th quarter there will be a timing difference between inflows and outflows, requiring liquidity on a portion of the $290.5 million in auction rate securities." Id. In the words of LES's general counsel, Michelle Gluck, LES desired SunTrust to be "involve[d]" in LES's "liquidity plan," and thus sought to keep SunTrust apprised of its efforts. J.A. 836. Indeed, on October 23, 2008, Gluck expressed her "appreciate[ion]" that Edwards and Bill Mayfield, who was also in SunTrust's general counsel's office, were "remaining in the loop." Id.

The fact that SunTrust allegedly knew all the above information does not amount to a plausible allegation that it "conspired with agents and representatives of LES . . . and engaged in concerted action for the united purpose of . . . defrauding the Exchangers out of their Exchange Funds," J.A. 812. To state a claim that SunTrust conspired to commit fraud, the Exchangers would have to allege that SunTrust not only knew about what LES was doing and failed to stop it; they would have to allege that SunTrust took concerted action with agents or representatives of LES "in furtherance" of a common purpose of defrauding the Exchangers, with a "mutual understanding" of that purpose. The allegations do not rise to this level.

35

The principal allegations of SunTrust's actions are the following. First, the Exchangers allege that even after SunTrust learned that LES was facing major liquidity problems, SunTrust "continue[d] to service the 3318 account and accept deposits received from unsuspecting Exchangers thereby assisting LES in processing purchases of replacement property for LES's prior exchangers with new exchangers' money." (SAC ¶95.) SunTrust was LES's bank; the 3318 account was at SunTrust's Richmond branch. The fact that SunTrust allowed LES to continue to make deposits into and withdrawals from the 3318 account is a far cry from the concerted action necessary to evince a decision to conspire in the defrauding of the Exchangers.

Second, the Exchangers allege that on November 29, 2007, SunTrust agreed to amend SunTrust's Revolving Credit Agreement to "reduc[e] certain financial covenants which LFG could not satisfy" so that LES and LFG would not need to disclose its inability to meet LES's credit obligations. (SAC ¶104.) The ARS market did not freeze until April 2008, however -- five months after the renegotiation of the line of credit. There simply is no correlation in that regard plausibly supporting concerted action with an intent to defraud.

Third, the Exchangers allege that SunTrust "assisted LES between November 21, 2008 and November 25, 2008, on the eve of bankruptcy cleaning out . . . the 3318 account of all but $1,"

36

processing "seven transfers totaling $46 million to [an account] at Smith Barney." (SAC ¶125.) The Exchangers immediately then concede, however, that the $46 million remained available to satisfy LES's creditors, and indeed was the subject of the dispute in bankruptcy over whether Exchange Funds were or were not part of LES's estate. (Id.)

Fourth, the Exchangers allege that in June 2008, in negotiating an amendment to LFG's revolving line of credit, SunTrust, despite knowing that LFG was "financially impaired," "avoided declaring LFG in default, which assisted LES to stay in the business to continue to solicit new Exchange Funds and perpetuate the known Ponzi scheme." (SAC ¶107.) As the Exchangers acknowledge, however, SunTrust had decided to reduce the amount it would allow LFG to borrow on its existing line of credit.[13] SunTrust's decision not to also declare LFG in default

_____

[13] This also rendered SunTrust's role distinguishable from certain creditors' alleged role in perpetuating Edward Okun's fraudulent scheme involving § 1031 exchange funds. In the district court the Exchangers argued SunTrust's role was analogous to the alleged role of certain defendants in Hunter v. Citibank, N.A., No. C 09-02079 JW, 2011 WL 7462143 (N.D. Cal. May 5, 2011), which the court found sufficient to state a claim of conspiracy to commit fraud and conversion. See id. at *6. There, however, the creditor defendants decided to lend Okun "millions of dollars" knowing "that the monies were being used to perpetuate Okun's Ponzi scheme" by "enabl[ing] him to continue [his] misconduct through lulling payments." Id.; see also United States v. Okun, 453 F. App'x 364 (4th Cir. 2011) (affirming 1,200-month sentence for Okun's fraud). There is no (Continued)

falls short of concerted action with the purpose of defrauding the Exchangers required under Virginia and California law.

Thus, the Exchangers have not alleged that SunTrust engaged in concerted action with the individual defendants, with a mutual understanding of a common purpose to defraud, required by Virginia and California law. Indeed, the allegations in the complaint and the hundreds of pages of emails and other documents attached to the complaint belie concerted action to defraud. SunTrust repeatedly expressed its concern to LES that, by using funds in LES's "safekeeping account" to purchase ARS, LES "may have violated its fiduciary duty and/or otherwise acted improperly with respect to these customers." J.A. 837. Furthermore, as noted, by June 30, 2008, SunTrust had reduced its loan commitment to LFG.

For these reasons, we conclude the Exchangers have not stated a claim for conspiracy to commit fraud, and affirm the dismissal of the Exchangers' conspiracy claim.

---

allegation here that SunTrust lent additional funds to LES once SunTrust knew of LES's liquidity problems.

III.

For the foregoing reasons, the judgment of the district court dismissing the Exchangers' claims against SunTrust is

AFFIRMED.