Filed 9/13/13  Merritt v. Mozilo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SALMA MERRITT et al., | H037414 |
| Plaintiffs and Appellants, | (Santa Clara County Super. Ct. No. CV159993) |
| v. | |
| ANGELO MOZILO et al., | |
| Defendants and Respondents. | |

Plaintiffs Salma Merritt and David Merritt obtained two loans to purchase their home.  After the Merritts were unable to repay the loans, they filed an action against multiple defendants for alleged predatory lending practices.  The named defendants are Angelo R. Mozilo, David Sambol, Michael Colyer, Countrywide Home Loans, Inc., and Countrywide Financial Corporation (collectively Countrywide defendants), Kenneth Lewis, and Bank of America Corporation (Bank of America), MERSCORP Holding, Inc. (MERS), First American Title Company (First American), and Johnny Chen.[1]  The third amended complaint alleged causes of action for conspiracy to commit the following: fraud (first cause of action); breach of fiduciary duty (second cause of action); unfair business practices (third, fourth, and fifth causes of action); breach of title insurance contract (sixth cause of action); and intentional infliction of emotional distress (seventh

---

[1]     Johnny Chen is not a party to this appeal.

cause of action).  The trial court overruled Countrywide defendants' demurrer to four causes of action and sustained their demurrer without leave to amend to three causes of action.  The trial court also sustained the demurrers of First American, MERS, Lewis, and Bank of America without leave to amend to all causes of action.

On appeal, the Merritts contend that the trial court erred:  (1) by failing to apply the elements of conspiracy law; (2) by refusing the proffered amendment to the third amended complaint and by failing to grant leave to amend; (3) by sustaining the demurrers to the conspiracy to commit breach of fiduciary duty, conspiracy to commit breach of title insurance contract, and conspiracy to inflict emotional distress causes of action as to Lewis, Bank of America, MERS and First American; and (4) by sustaining certain causes of action as to Countrywide defendants.

We conclude that this court lacks jurisdiction to consider the appeal as to Countrywide defendants and that the trial court did not err when it sustained the demurrers of First American and MERS.  We also conclude that the trial court erred in sustaining the demurrers of Bank of America and Lewis.  Accordingly, the judgments in favor of First American and MERS are affirmed and the judgments in favor of Bank of America and Lewis are reversed.

## I.  Statement of Facts[2]

### A.  The Merritts' Initial Loan Transaction

In February 2006, the Merritts entered into an agreement to purchase a townhouse in Sunnyvale for $729,000.  The Merritts spoke to one lender who offered to provide

---

[2]  The Merritts are representing themselves.  The statement of facts is based on the allegations in the 100-page third amended complaint.  This court has augmented the record on appeal to include 279 pages of exhibits that were attached to the third amended complaint.  We " 'accept as true both facts alleged in the text of the complaint and facts appearing in exhibits attached to it.  If the facts appearing in the attached exhibit contradict those expressly pleaded, those in the exhibit are given precedence. [Citations.]' " (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 245.)

them with a loan with monthly payments of $4,600 per month while another offered a loan with monthly payments of $4,800. The Merritts then contacted Colyer, who was employed by Countrywide. Colyer told them that he could arrange a loan with payments "maybe 40 percent lower" than what the other lenders had quoted. The Merritts provided Colyer with their financial information, which stated that David Merritt's gross income for 2006 would be $60,000 and Salma Merritt would receive temporary disability payments of $5,200.[3] The disability payments would decrease to $1,400 in September 2008.

On March 15, 2006, two days before the deadline to remove the loan contingency from the purchase agreement, Colyer gave the Merritts a good faith estimate based on a 30-year Federal Housing Administration (FHA) loan for $729,000 with an interest rate between 1 and 3 percent. This written estimate indicated that monthly payments would be between $1,800 and $2,200 for principal and interest if the Merritts made a down payment of 5 percent of the purchase price. Relying on the estimate, the Merritts removed the loan contingency on their purchase agreement.

On March 20, 2006, Colyer informed the Merritts that his underwriters were reluctant to approve their loan. About five days later, he informed the Merritts that he was able to work out a loan with monthly payments of $5,200. When the Merritts told him that they could not afford this loan, he told them that they would be subject to a lawsuit if they did not close escrow. The Merritts then contacted the two lenders from whom they had previously obtained estimates, and they were told that there was not enough time to underwrite the loan prior to the close of escrow.

On March 26, 2006, Colyer called the Merritts and told them that he was able to secure "'the best loan possible.'" This new loan was actually two loans or a "'Combo loan'" that consisted of a 30-year adjustable rate mortgage for $591,200 (first loan) and a

---

[3]    There is no indication as to how frequently Salma Merritt would receive these payments.

home equity line of credit (HELOC) for $147,800. The interest-only payments on the first loan were $3,202.33 per month and the interest rate was 6.5 percent for the first five years. The interest rate on the HELOC was 7.5 percent the first month and adjusted periodically thereafter. The Merritts would eventually be required to pay $6,693 per month on the first loan and an additional $2,400 per month in interest on the HELOC.

On March 26, 2006, Financial Title Company (FTC) provided Javani Wyatt, its escrow agent, with two sets of documents that were partially filled out with financial information. FTC also "instructed her to do whatever she could to convince [the Merritts] to sign their set of documents, leave [them] with the second mostly blank documents and return them to her supervisor." When David Merritt began reading the documents, Wyatt stated that she did not have time for him to read them and that she would provide the Merritts with a copy of every document so they could read them later. The Merritts signed the documents. When David Merritt began making copies of the signed documents, Wyatt told him that they would be able to get signed copies from Countrywide.

On March 29, 2006, Colyer filled in the blank portions of the documents that the Merritts had signed and returned them to First American. Does 91-95 of First American recorded the deeds of trust and the notes, and transmitted the deeds of trust to Bear Stearns and the notes to MERS. MERS transmitted the notes to Wells Fargo. The deeds of trust for the first loan and the HELOC, which were recorded on March 30, 2006, stated that the borrowers were the Merritts, the lender was Countrywide Home Loans, Inc., the trustee was Recontrust Company, N.A., and MERS was the nominee for the lender.

Between October 2006 and October 2008, the Merritts contacted Countrywide defendants, Lewis, Chief Executive Officer (CEO) of Bank of America, and Wells Fargo, and requested their signed loan documents. The documents were not provided. The Merritts also asked that their loans be replaced with an FHA loan "or other traditional loan that they could afford to repay."

4

Between May 2006 and October 2008, Countrywide defendants, Lewis, and Bank of America charged the Merritts four to seven interest rate points above the amount set forth in the HELOC agreement. On January 20, 2009, Bank of America provided the Merritts with copies of their loan documents, but "these documents were different, specifically the HELOC Agreement and Note than what [the Merritts] recall[ed]."

**B. Loan Modification**

In February 2009, Does 71-80 of Bank of America "produced a modification of original loans on orders of Wells Fargo" pursuant to its agreement with Bear Stearns "in order to cover up . . . March 2006 fraudulent acts" and "the 2006 to 2008 overcharges." The loan modification "was a continuation of predatory lending practices of Countrywide." Though the new loan provided a temporary 4.5 percent interest rate, Does 71-80 "continued to mislead [the Merritts] b[]y representing that they only needed to pay the interest and was in fact designed to not pay down the principle." They also failed to disclose that the payments did not include the HELOC payments, payment of property taxes, homeowners insurance, and other fees.

**C. Allegations of Defendants' Roles in Alleged Conspiracy**

**1. Background**

Beginning in January 1993, James Cayne, CEO of Bear Stearns, directed brokers to encourage private investors to place their funds into mortgage-backed security pools, which would be lent to individuals seeking residential loans. Cayne then began implementing a plan in which Bear Stearns would identify real estate brokers "who would agree to represent to borrowers that they were purchasing loans that were traditional loans – i.e. fixed 30 year loan[s] – and *conceal* the fact that the loans were not conventional loans at all[.]"

5

## 2. First American and MERS

In January 1995, Does 2-30 of Bear Stearns first met with Kennedy, CEO of First American, and R.K. Arnold, CEO of MERS. Additional meetings were held in February and March 1995, in which Does 2-30 of Bear Stearns explained how they wished to work with Kennedy, Arnold, and Wells Fargo "to make enormous amounts of money from residential mortgage borrowers." Does 2-30 informed them that "they were going to solicit billions in private dollars to fund mortgages for borrowers and needed to employ brokers willing to craft loans designed to strip equity from Americans, increase likelihood of loan defaults and to give Investors the opportunity to foreclose and resell properties to make more profit. . . . Bear Stearns with Does 2-30 stated that in order to conceal their identities from public record they would need Loan Brokers, Escrow and Title agents, to not record Investors names with local County Clerk Recorders, but to falsify local County Recorder Records by naming some entity in their place who would be bound to not divulge their identities publicly."

On February 15, 1995, Arnold informed Bear Stearns that he would form MERS, which would record its name with county recorders in place of Bear Stearns, and thus conceal Bear Stearns' identity from borrowers. Between January 2000 and December 2010, Arnold instructed MERS members not to disclose to borrowers, including the Merritts, that MERS was acting as a front man for Bear Stearns.

In February 1995, Kennedy presented the Bear Stearns proposal to the First American Board of Directors. The board of directors then approved the agreement with Bear Stearns that called for First American "to instruct and train its Escrow and Title Insurance staff to falsify county records and not report title defects to borrowers or the public."

In early 2000, MERS agreed to enroll Countrywide as a member if Mozilo would agree to "lead Countrywide into falsifying loan documents and county records, as well as keeping secret the fraudulent nature of [MERS], its activities and purposes."

6

Between January 2000 and March 2006, First American entered into agreements with various title companies to produce escrow and title search functions that First American could underwrite. Between January 2006 and March 2006, First American also required these companies to ignore title defects.

On March 20, 2006, First American directed its agent FTC to conduct a title search of the subject property. The subject property "was recorded as belonging to MERS," the "Note was separated from deed of trust," and there were "multiple breaks in the title, possibly more than a dozen holders in due course claiming rights to Property and no way to validate a clean title." First American directed its FTC agent to ignore the title defects, to issue a preliminary title report, and to withhold certain documents from the Merritts so that they would not learn of the title defects.

On March 27, 2006, Does 91-95 of First American instructed Wyatt, pursuant to its agreement with Bear Stearns, to take two sets of documents, which consisted of two notes and two deeds of trust, to the Merritts' home for their signatures. Does 91-95, acting on instructions from Colyer, did not include material terms of the loan in the set of documents that were to be given to the Merritts, such as the amount of payments and the interest rates. These documents, however, stated that the amount of the first loan was $591,200 and that of the HELOC was $147,800, and that MERS was a beneficiary.

### 3. Bank of America and Lewis

Between January and May 2000, Does 2-30 of Bear Stearns held talks with Lewis, CEO of Bank of America, and Mozilo, CEO of Countrywide, "about lending money to mortgage borrowers which they wished to hire Countrywide to broker for Bear Stearns." During these discussions, Lewis informed Countrywide that Bank of America wanted to lend subprime loans to achieve greater profits, but "they did not wish to lend predatory loans directly . . . and wished to use Countrywide to broker their funds with certain types of borrowers."

7

On April 15, 2000, Does 2-30 of Bear Stearns and Lewis explained to Mozilo and other Countrywide officers that Bear Stearns and Bank of America "would provide Countrywide with the loan contract agreements" that they "needed Countrywide to get borrowers to sign, and such contracts required Mozilo to design loans in a way which would strip borrowers savings, income and property equity before leading to default and foreclosure after statute of limitations had run out on breach of contract, fraud and other civil limitations." A month later, Does 2-30 of Bear Stearns and Lewis told Mozilo that Countrywide would have to conceal that it was acting as a broker for Bear Stearns or Bank of America. If Mozilo agreed to the terms discussed during the meetings, Bear Stearns would lend funds to borrowers for whom Mozilo brokered loans. Bear Stearns provided Mozilo with a "Master Repurchase Agreement" which committed Countrywide to broker loans for Bear Stearns and Bear Stearns would fund such loans as long as the terms of the loans met the specifications that Bank of America and Bear Stearns required. The Countrywide Board of Directors then authorized Mozilo and others to enter into agreements with Bear Stearns, Bank of America, Wells Fargo, MERS, and First American.

Between March 2000 and March 2006, Does 2-30 of Bear Stearns and Lewis, on behalf of Bank of America, entered into agreements that committed them to providing funds for Countrywide "to find borrowers who could be induced into buying subprime and later HELCO/Pay Option ARM 'Combo' loans."

Between March and December 2000, Mozilo, Lewis, Does 2-30, and Wells Fargo spoke with each other monthly regarding Mozilo's "efforts to move Countrywide to broker subprime loans for them." In June 2000, Bear Stearns and Lewis asked Mozilo to "disregard California laws regarding his real estate broker fiduciary duties, and to manage Countrywide in a way which publicly presented Countrywide as the actual lender of the funds being loaned out." Mozilo agreed to do so.

8

Between July and September 2000, Sambol, president of marketing for Countrywide, instructed Does 31-50 of Countrywide to prepare training programs for brokers, such as Colyer, on how to conceal from borrowers Countrywide's predatory lending practices. Between January 2001 and March 2006, Sambol also worked with others to design loans "with payments that increased over time to take 75, 90 and more than 100% of borrowers income so they could ensure that borrower would default and be subjected to foreclosure." These loans were designed pursuant to agreements Mozilo made with Bear Stearns and Bank of America.

Between 2003 and 2007, "approximately 50% of the loans produced by Countrywide were loans brokered for" Bear Stearns and Bank of America. Lewis spoke with Mozilo between January 2006 and December 2007. Mozilo told Lewis that he would sell Countrywide "at a very cheap price" to Bank of America if Lewis "would do whatever he could to cover up Mozilo et al deeds in the event their fraud became known and they were prosecuted." Lewis presented this proposal to the Bank of America Board of Directors in December 2007. The board of directors authorized Lewis "to enter into this and other details of agreement with Mozilo and his team."

Between December 2007 and July 2008, Lewis and Mozilo negotiated the terms of the sale of Countrywide to Bank of America. Lewis assured Mozilo that he "would cover up the predatory loan practices and other frauds committed by Mozilo, Sambol and others." After an audit of Countrywide was conducted, Lewis learned that "most of the Countrywide loans which they had sold, including [the Merritts' loan] were predatory loans . . . and that Countrywide was intentionally falsifying monthly charges to borrowers," including the Merritts. After Lewis lobbied the board of directors to view this as "a good opportunity" for Bank of America, the board of directors accepted Lewis' assessment and his agreement with Mozilo to cover up Countrywide's fraud. The board of directors also "agreed that since they were generating hundreds of millions of dollars in additional profits by falsely overcharging borrowers, that they would not stop

9

overcharging borrowers, including [the Merritts], unless borrowers complained." Between July 2008 and March 2009, Bank of America sent the Merritts monthly billing statements which overcharged them.

## II. Statement of the Case

In December 2009, the Merritts filed a complaint against Countrywide defendants, Lewis, Bank of America, Wells Fargo, Chen, and John Stumpf for restitution, injunctive relief, rescission, and civil penalties. The complaint alleged causes of action for conspiracy to commit fraud, misleading statements, unfair business practices, violation of Civil Code section 1920, race discrimination in housing, and conspiracy. After Bank of America filed a demurrer to the complaint, the trial court sustained the demurrers with leave to amend to five causes of action and overruled the demurrers to the conspiracy cause of action.

In August 2010, prior to the deadline for First American to file its response to the initial complaint, the Merritts filed a first amended complaint pursuant to Code of Civil Procedure section 472 against Countrywide defendants, Lewis, Bank of America, Chen, John Benson, MERS, and First American. The causes of action alleged in the first amended complaint included fraud, conspiracy, breach of fiduciary duty, unfair business practices, breach of contract, breach of title insurance contract, and intentional infliction of emotional distress. Following demurrers to the first amended complaint, the trial court sustained the demurrers of Countrywide defendants, Lewis, Bank of America, and MERS with leave to amend. However, the trial court sustained Wells Fargo's demurrer without leave to amend. The Merritts filed an appeal from the order sustaining the demurrer of Wells Fargo without leave to amend.

Before the hearing on First American's demurrer to the first amended complaint in December 2010, the Merritts filed a second amended complaint against the same defendants with the exception of Wells Fargo. The second amended complaint alleged

10

causes of action for fraud and misrepresentation, conspiracy, breach of fiduciary duty, unfair business practices, breach of contract, breach of title insurance contract, and intentional infliction of emotional distress. The trial court then sustained demurrers to the second amended complaint with leave to amend.

In April 2011, the Merritts filed their third amended complaint. The third amended complaint alleged causes of action for conspiracy to commit the following: fraud, breach of fiduciary duty, unfair business practices, breach of title insurance contract, intentional infliction of emotional distress. In July 2011, the Merritts filed an amendment to their third amended complaint. Following a hearing in August 2011 on the demurrers to the third amended complaint, the trial court issued an order striking the amendment to the third amended complaint. The trial court also sustained the demurrers of First American, MERS, Lewis, and Bank of America without leave to amend to all causes of action. However, the trial court overruled Countrywide defendants' demurrer to four causes of action and sustained their demurrer without leave to amend to three causes of action.

In October 2011, the Merritts filed a notice of appeal.

In December 2011, this court reversed the judgment in *Merritt v. Wells Fargo Bank, N.A.* (Dec. 19, 2011, H036259) [nonpub. opn.] and directed the trial court to enter a new order sustaining Wells Fargo's demurrer to the first and second causes of action with leave to amend to state a single cause of action for conspiracy to defraud.[4] This court also rejected the Merritts' procedural claims and concluded that they had waived their claims of error regarding their causes of action for unfair business practices, breach of fiduciary duty, breach of contract, breach of the title insurance contract, and intentional infliction of emotional distress.

---

[4] This court has taken judicial notice of the opinion in case No. H036259, *Merritt v. Wells Fargo Bank, N.A.*

11

### III. Discussion

### A. Jurisdiction

Countrywide defendants contend that this court lacks jurisdiction to consider the appeal as to them. They point out that the trial court overruled their demurrer to the first, third, fourth, and fifth causes of action.

"In general, the right to an appeal is entirely statutory; unless specified by statute no judgment or order is appealable." (*Garau v. Torrance Unified School Dist.* (2006) 137 Cal.App.4th 192, 198.) Code of Civil Procedure section 904.1, subdivision (a) provides that only final judgments are appealable. "Judgments that leave nothing to be decided between one or more parties and their adversaries . . . have the finality required by section 904.1, subdivision (a)." (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 741.) Here, as the Merritts concede, a final judgment has not been entered against Countrywide defendants. Thus, this court lacks jurisdiction to consider the appeal as to them.

The Merritts' reliance on *Kuperman v. Great Republic Life Ins. Co.* (1987) 195 Cal.App.3d 943 (*Kuperman*) is misplaced. In that case, the trial court struck the plaintiffs' third amended complaint in its entirety, thereby leaving no issues to be determined between the plaintiffs and one of the defendants. (*Id.* at pp. 946-947.) The Court of Appeal held the order was appealable as a final judgment. In contrast to *Kuperman*, here, issues remain to be determined between the Merritts and Countrywide defendants.

The Merritts also argue that policy reasons support treating the trial court's order as an appealable order. However, appellate review is available only where authorized by statute, and Code of Civil Procedure section 904.1 does not grant us jurisdiction on this basis.

The Merritts alternatively request that we treat their appeal as a petition for a writ of mandate. "'A petition to treat a nonappealable order as a writ should only be granted

under [the most] extraordinary circumstances, "'compelling enough to indicate the propriety of a petition for writ . . . in the first instance . . . .' [Citation.]"'" (*Wells Properties v. Popkin* (1992) 9 Cal.App.4th 1053, 1055.) Since the circumstances before us are neither extraordinary nor compelling, we decline to treat the present appeal as to Countrywide defendants as a petition for a writ of mandate.

We next consider the issue of our jurisdiction as to the other defendants. Though the record contains a judgment of dismissal in favor of First American and thus is appealable under Code of Civil Procedure section 904.1, there is no judgment of dismissal in favor of Lewis, Bank of America or MERS. "The general rule of appealability is this: 'An order sustaining a demurrer without leave to amend is not appealable, and an appeal is proper only after entry of a dismissal on such an order.' [Citation.] But 'when the trial court has sustained a demurrer to all of the complaint's causes of action, appellate courts may deem the order to incorporate a judgment of dismissal, since all that is left to make the order appealable is the formality of the entry of a dismissal order or judgment.'" (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 528, fn. 1.) Thus, we will treat the order sustaining the demurrers of Lewis, Bank of America, and MERS as appealable.

### B.  Sufficiency of the Third Amended Complaint

#### 1.  Waiver

We first consider whether the Merritts have failed to substantively address their conspiracy to commit fraud cause of action (first) and conspiracy to commit unfair business practices causes of action (third, fourth, and fifth), and thus have waived any argument of error by the trial court in sustaining the demurrer without leave to amend to these causes of action.

We presume that the judgment is correct and the appellant has the burden of overcoming this presumption by affirmatively showing error. (*Ketchum v. Moses* (2001)

13

24 Cal.4th 1122, 1140-1141.) "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived. [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

In challenging the trial court's ruling on the conspiracy to commit fraud and the conspiracy to commit unfair business practices causes of action, the Merritts rely on the legal principles on conspiracy and fraud as set forth in *Merritt v. Wells Fargo Bank, N.A.* Thus, they have met their burden as to the conspiracy to commit fraud cause of action. However, there was no discussion in that case regarding the conspiracy to commit unfair business practices. In the present appeal, the Merritts have failed to present any reasoned argument with citations to authority as to the underlying tort of unfair business practices. They do not set forth the elements of unfair business practices and how their third, fourth, and fifth causes of action survive the demurrers. Merely summarizing the allegations in the third amended complaint and claiming that the trial court did not understand the elements of conspiracy law is insufficient.[5] Though we conclude that they have not waived the issue of whether the trial court erred in sustaining the demurrer to the first cause of action for conspiracy to commit fraud, the Merritts have waived any further claim of error on appeal with regard to the third, fourth, and fifth causes of action.

## 2. Standard of Review

"In determining whether plaintiffs properly stated a claim for relief, our standard of review is clear: ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.

---

[5]    We remind the Merritts that self-represented litigants are "held to the same standards as attorneys. [Citation.]" (*Kobayashi v. Superior Court* (2009) 175 Cal.App.4th 536, 543.) "[S]elf-representation is not a ground for exceptionally lenient treatment." (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 984.)

14

[Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff.' [Citations.]" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)

### 3. Conspiracy

Since each cause of action alleges a conspiracy to commit a specified tort, we summarize the general principles regarding conspiracy. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511 (*Applied Equipment*).) However, "[b]y its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Id.* at p. 511.)

"The elements of a civil conspiracy are '(1) the formation and operation of the conspiracy; (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting. [Citations.]'" (*Mosier v. Southern Cal. Physicians Ins. Exchange* (1998) 63 Cal.App.4th 1022, 1048.) Because civil conspiracy is easy to allege, "plaintiffs have a weighty burden to prove it. [Citation.] They must show that each member of the conspiracy acted in concert and came to a mutual understanding to accomplish a common and unlawful plan, and that one or more of them committed an overt act to further it.

15

[Citation.] It is not enough that the conspiring officers knew of an intended wrongful act, they had to agree—expressly or tacitly—to achieve it. Unless there is such a meeting of the minds, ' "the independent acts of two or more wrongdoers do not amount to a conspiracy." ' " (*Choate v. County of Orange* (2000) 86 Cal.App.4th 312, 333.)

"[A] plaintiff is entitled to damages from those defendants who concurred in the tortious scheme with knowledge of its unlawful purpose. [Citation.] Furthermore, the requisite concurrence and knowledge ' " 'may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " ' [Citation.] Tacit consent as well as express approval will suffice to hold a person liable as a coconspirator." (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 784-785.)[6]

### a. First Cause of Action – Conspiracy to Commit Fraud

The Merritts contend that "the CEO's with Boards of Directors of Bear Stearns, Wells Fargo, MERS[], [First American, Bank of America] and Countrywide . . . entered into agreements as early as 2000 and onward, to help Bear Ste[a]rns defraud borrowers."

"The elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.) " 'Promissory fraud' is a subspecies of the action for fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.] [¶] An action for promissory fraud may lie where a defendant fraudulently

---

[6] The Merritts allege in the first, second, sixth and seventh causes of action that defendants "knowingly and willfully conspired and agreed among themselves to" commit the underlying torts. Conclusory allegations regarding the formation and operation of a conspiracy are insufficient and are disregarded. (*Choate v. County of Orange, supra*, 86 Cal.App.4th at p. 333.)

16

induces the plaintiff to enter into a contract. [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice. [Citations.] '. . . [¶] This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered."' [Citation.] A plaintiff's burden in asserting a fraud claim against a corporate employer is even greater. In such a case, the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.' [Citation.]" (*Lazar*, *supra*, 12 Cal.4th at p. 645.)

In the present case, the third amended complaint alleges that, executives of Bear Stearns, Bank of America, and Countrywide held talks to discuss lending money to mortgage borrowers beginning in 2000. Lewis informed Countrywide that Bank of America wanted to lend subprime loans to achieve greater profits, it did not want to be publicly identified with predatory lending, and it wanted Countrywide to target certain borrowers. Bank of America would also provide Countrywide with contracts for borrowers to sign that would be designed "so borrowers would not be able to pay off loans," thereby leading to default and foreclosure. Between March and December 2000, executives of Countrywide, Bank of America, and Wells Fargo spoke monthly regarding Mozilo's "efforts to move Countrywide to broker subprime loans for them." Lewis also asked Mozilo to "disregard California laws regarding his Real Estate Broker fiduciary duties" which Mozilo agreed to do. Pursuant to this plan, Countrywide began a training program for its brokers on predatory lending practices as well as a deceptive marketing campaign. Between 2003 and 2007, approximately 50 percent of the loans produced by Countrywide were funded by Bear Stearns and Bank of America. Beginning in January 2006, Lewis and Mozilo discussed Bank of America's purchase of Countrywide "at a very cheap price" if Bank of America agreed to cover up Countrywide's fraudulent

17

conduct. In December 2007, the Bank of America Board of Directors authorized Lewis to enter into the agreement with Countrywide, and Bank of America purchased Countrywide in July 2008. Bank of America then learned that "most of Countrywide's loans which they had sold, including [the Merritts], were predatory loans" and that "Countrywide was intentionally falsifying monthly charges to borrowers" including the Merritts. Between July 2008 and March 2009, Bank of America continued Countrywide's practice of overcharging the Merritts. In 2009, the Merritts signed a loan modification agreement with Bank of America, which "was a continuation of predatory lending practices of Countrywide," and Bank of America misled them as to the terms of the agreement.

Here, there are no allegations that Bank of America had any interest in the Merritts' first loan or the HELOC or that they funded these loans, thus distinguishing it from Wells Fargo's participation in the conspiracy to defraud the Merritts. However, Lewis, on behalf of Bank of America, agreed before the Merritts obtained their loans from Countrywide to supply Countrywide with funds if Countrywide would sell subprime loans for Bank of America. Bank of America also specified the terms of the loans that Countrywide would offer to borrowers. Thus, Lewis and Bank of America participated in the formation of the conspiracy with Countrywide and came to a mutual understanding of how to accomplish their unlawful goal. After Countrywide implemented the plan, Lewis and Bank of America agreed to cover up Countrywide's fraudulent conduct, continued Countrywide's practice of overcharging the Merritts, and misled them as to the terms of the loan modification agreement. Thus, these allegations were sufficient to state a cause of action against Bank of America and Lewis for conspiracy to commit fraud.

As to First American and MERS, the first cause of action alleges that Kennedy and Arnold met with Bear Stearns and agreed to conceal Bear Stearns' identity from borrowers. First American and Arnold would ignore "title defects." These title defects

18

consisted of: (1) deeds of trust showing MERS as the beneficiary, and (2) the "separation" of deeds of trusts and the underlying notes resulting from loan securitization.

"As case law explains, 'MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS. MERS is listed as the grantee in the official records maintained at county register of deeds offices. The lenders retain the promissory notes, as well as the servicing rights to the mortgages. The lenders can then sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members.' [Citation.]" (*Gomes v. Countrywide Home Loans, Inc.* (2011) 192 Cal.App.4th 1149, 1151 (*Gomes*).) Under California law, MERS has authority to act as the beneficiary under a deed of trust. (*Gomes*, at pp. 1155-1156 [MERS authorized to initiate foreclosure as deed of trust beneficiary]; *Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 270-271 [MERS has the authority to act as nominee for the lender] (*Fontenot*).) Here, the deeds of trust state that MERS was "the beneficiary." However, the deeds of trust also specifically restrict MERS' interest to that of a " 'nominee' " for the lender. "A 'nominee' is a person or entity designated to act for another in a limited role—in effect, an agent." (*Fontenot*, at p. 270.) The Merritts have not alleged that they were unable to make their payments or negotiate a modification of their loans because they did not know who the lender was. Thus, the Merritt's contention that MERS is not a proper beneficiary under the deed of trust cannot support their claim that First American and MERS engaged in any fraudulent conduct by recording MERS as a beneficiary.

Similarly, the Merritts' allegations that securitization of the loans constituted a title defect do not state a claim of conspiracy to commit fraud against First American and

19

MERS. Securitization does not affect the validity of a loan. A secured promissory note that is traded on the secondary market remains secured because the mortgage or deed of trust follows the note. (Civ. Code, § 2936 ["The assignment of a debt secured by mortgage carries with it the security."].) Thus, a lender or trustee does not lose its interest in the loan when it "was packaged and resold in the secondary market, where it was put into a trust pool and securitized." (*Lane v. Vitek Real Estate Industries Group* (E.D.Cal. 2010) 713 F.Supp.2d 1092, 1099; *Hafiz v. Greenpoint Mortgage Funding, Inc.* (N.D.Cal. 2009) 652 F.Supp.2d 1039, 1043 [rejecting the plaintiff's theory that "defendants lost their power of sale pursuant to the deed of trust when the original promissory note was assigned to a trust pool"].)

The Merritts also alleged that First American was liable for misrepresentation and concealment of material facts because it was an agent of the other defendants. However, conclusory agency or secondary liability allegations are insufficient to state a cause of action. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 133-134, fn. 12 (*Moore*).) The Merritts further alleged that Wyatt, who was an agent of First American, gave the Merritts documents which "were partially filled out with financial information." These allegations are also insufficient to state a claim that First American participated in a conspiracy to defraud the Merritts. First American was the escrow agent in the transaction, and its only duty was to comply with the written instructions of the parties to the escrow. (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711 (*Summit*).) First American had nothing to do with arranging, brokering, processing, underwriting, or making the loans to the Merritts.

In sum, the Merritts stated a cause of action for conspiracy to commit fraud against Bank of America and Lewis. However, the trial court properly found that it failed to state a cause of action against First American and MERS.

20

### b. Second Cause of Action – Conspiracy to
### Commit Breach of Fiduciary Duty

"In order to plead a cause of action for breach of fiduciary duty, there must be shown the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach." (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101, superseded by statute on another ground as stated in *Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 396.) To state a cause of action for conspiracy to breach a fiduciary duty, a plaintiff must establish that each of the coconspirators owed a fiduciary duty to him or her and are potentially subject to liability for breach of that duty. (*Applied Equipment*, *supra*, 7 Cal.4th at p. 511.)

It is not clear what the Merritts' arguments are as to this cause of action. They begin by summarizing the allegations in the third amended complaint and assert that these facts "support fiduciary claim." They then rely on *Smith v. Home Loan Funding, Inc.* (2011) 192 Cal.App.4th 1331 (*Smith*) for the proposition that "it is not a Company's name or how a Company is registered, or even mostly conducts business with most borrowers, but how they actually behave on a case-by-case basis. That is what determines whether a registered mortgage broker forms a fiduciary relationship or not."[7]

*Smith* recognized that "[a] mortgage broker has a fiduciary duty to a borrower. A mortgage lender does not." (*Smith*, *supra*, 192 Cal.App.4th at p. 1332.) In *Smith*, the defendant funded most of its loans to borrowers and brokered other loans to third party lenders. (*Ibid.*) One of the defendant's loan officers told the plaintiff that he was a mortgage broker and that he could "'shop the loan'" for her. (*Id.* at p. 1333.) Though the loan officer repeatedly told the plaintiff that the loan would not have a prepayment penalty, a prepayment penalty was included in a rider to the promissory note. (*Id.* at

---

[7]    The Merritts also alleged that each of the defendants was an agent for the other defendants. As previously stated, conclusory agency or secondary liability allegations are insufficient to state a cause of action. (*Moore*, *supra*, 51 Cal.3d 120, 133-134, fn. 12.)

p. 1334.) *Smith* held that there was substantial evidence that the defendant and its loan officer acted as mortgage brokers and breached their fiduciary duties to the plaintiff. (*Id.* at pp. 1335-1336.)

Here, the Merritts have not alleged any facts that Bank of America and Lewis acted as mortgage brokers. Since they acted as lenders, they owed no fiduciary duty to the Merritts.[8]

We next consider the nature of the duty owed by First American and MERS to the Merritts. First American owed a fiduciary duty to the parties to the escrow. (*Summit*, *supra*, 27 Cal.4th at p. 711.) However, as previously stated, First American's duty was to comply with the written escrow instructions. (*Ibid.*) "Absent clear evidence of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions." [Citations.]" (*Ibid.*) Here, the Merritts did not allege that First American breached any escrow instructions. They appear to be arguing that First American breached its fiduciary duty by recording MERS as the beneficiary under the deed of trust, thereby falsifying records and failing to inform the Merritts of title defects. As previously discussed, neither First American nor MERS engaged in any fraudulent conduct. Moreover, the Merritts cite no authority for the proposition that MERS owed a fiduciary duty to them.

### c. Sixth Cause of Action - Conspiracy to
### Breach of Title Insurance Contract

The Merritts also contend that though they titled the cause of action as conspiracy to breach title insurance contract, "the allegations show[] . . . [First American] and its

---

[8] For the same reason, *Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773 does not assist the Merritts' position. In *Wyatt*, the defendants were engaged in the loan brokerage business. Prior to signing the loan documents, the plaintiffs asked the broker about "the rate of interest, late payments, and the size of the balloon payment due at the end of the loan period." (*Id.* at p. 782.) Since the broker provided "materially misleading and incomplete information," *Wyatt* held that there was substantial evidence to support the finding that the defendants had breached their fiduciary duties to the plaintiffs. (*Id.* at pp. 782-783.)

agent FTC, was hired by the Merritts with its promise to perform fraud-free Title Search, fraud-free Title Report and fraud-free Close of Escrow."

In this cause of action, the Merritts alleged that First American issued a policy of title insurance to them, breached the policy by recording MERS as the beneficiary and refused to indemnify them for their losses pursuant to the terms of the policy. The Merritts also alleged that Countrywide defendants, Bear Stearns, Wells Fargo, MERS, and First American "conspired and agreed among themselves to breach the Title Insurance purchased" by the Merritts.

However, the Merritts cannot state a claim for conspiracy to breach a title insurance contract, because no such cause of action exists. "Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.]" (*Applied Equipment*, *supra*, 7 Cal.4th at pp. 510-511.) Given that there can be no cause of action for conspiracy to breach a title insurance contract, the trial court properly sustained the demurrer to the sixth cause of action as to Bank of America, Lewis, MERS, and First American.

Moreover, to the extent that the Merritts are now contending that First American breached its contract with them, their contention fails. First, as previously discussed, recordation of the deeds of trust which designated MERS as the beneficiary is not actionable under California law. Second, schedule B of the policy, which was attached to the third amended complaint, states that "this Policy does not insure against loss, costs, attorneys' fees, and expenses resulting from . . . [¶] . . . [¶] [the] Deed of Trust . . . ." Third, the Merritts' claim that First American breached the title policy by refusing to deliver copies of the loan documents, failing to close escrow at the title company, discouraging them from reading the loan documents, not preparing the appropriate number of copies of the loan documents, failing to deliver a notice of their right to rescind the loans with filled in dates, not delivering Truth in Lending disclosures filled in,

and refusing to allow David Merritt to make copies of their signed loan documents has no merit. "Title insurance is a contract by which the title insurer agrees to indemnify its insured against losses caused by defects in or encumbrances on the title not excepted from coverage. [Citation.]" (*Vournas v. Fidelity Nat. Title Ins. Co.* (1999) 73 Cal.App.4th 668, 675.) The Merritts' allegations are not covered under the policy and thus cannot constitute a breach of the title policy.

### d. Seventh Cause of Action – Conspiracy to Commit Intentional Infliction of Emotional Distress

The Merritts next contend that Countrywide defendants, First American, MERS, Lewis, Bank of America, and Bear Stearns conspired to intentionally inflict emotional distress on them. They argue that they were promised "one 30-year fixed loan with payments between $1,800 and $2,200; but were given at the very last moment two loans totaling $5,000 and set to balloon into $10,000 monthly installments" and were overcharged on their loans.

The elements of an intentional infliction of emotional distress claim are (1) the defendant's conduct was extreme and outrageous; (2) the defendant intended to cause emotional distress or recklessly disregarded the probability of causing emotional distress; (3) the plaintiff suffered severe emotional distress; and (4) the defendant's outrageous conduct was the cause of the severe emotional distress. (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 209 (*Davidson*).)

*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892 (*Sanchez-Corea*) provides an example of outrageous conduct by a lender. In *Sanchez-Corea*, McGowen, a vice-president with the defendant bank, handled the account for the plaintiffs' company and used bank funds to cover overdrafts on this account without the bank's knowledge. (*Id.* at pp. 896-897.) The bank also provided a loan of $70,000 to the plaintiffs. (*Id.* at p. 897.) After the bank discovered that McGowen had embezzled funds, including $240,000 that was allegedly credited to the plaintiffs' account, the bank demanded

24

$240,000 from the plaintiffs and refused to extend additional credit. (*Ibid.*) The plaintiffs disagreed with the bank as to the amount of money that they owed and eventually brought suit against the bank. (*Ibid.*) The California Supreme Court concluded that there was sufficient evidence to support the award of damages to the plaintiffs for intentional infliction of emotional distress, and summarized the evidence as follows: "There is evidence from which the jury could have determined that the Bank acted outrageously in reaction to the plight in which the Sanchez-Coreas found themselves as a result of vice president McGowen's conduct. Testimony indicated that Bank officers Jones and Timerman failed to advise plaintiffs that the Bank had determined not to give [the plaintiffs' company] any further loans. According to Sanchez-Corea, the Bank's office misrepresented to him that further financial assistance would be forthcoming but only if plaintiffs assigned all their past, present and future accounts receivable to the Bank. A day after the plaintiffs made such an assignment, the Bank refused the further loan. There was evidence that the Bank forced the Sanchez-Coreas to execute excessive guarantees and security agreements. In addition to [the plaintiffs' company's] pledge of over $262,000 of accounts receivable for a $70,000 note, Mrs. Sanchez-Corea executed a $50,000 guaranty for a $30,000 note, and Mr. Sanchez-Corea was directed to purchase a life insurance policy in the amount of $40,000 naming the Bank as beneficiary. Furthermore, there was extensive testimony about an incident at the San Franciscan Hotel in San Francisco. According to the testimony, Bank officials publicly ridiculed Mr. and Mrs. Sanchez-Corea, using profanities in their statements. A friend who was with the Sanchez-Coreas testified that Bank employees were pointing at the Sanchez-Coreas and the employees were laughing about the financial plight of [the plaintiffs' company]." (*Id.* at pp. 908-909.)

In contrast to *Sanchez-Corea*, here, as a matter of law, none of the conduct alleged by the Merritts was " 'so extreme as to exceed all bounds of that usually tolerated in a civilized community. [Citations.]' " (*Davidson*, *supra*, 32 Cal.3d at p. 209.)

25

Accordingly, the trial court did not err by sustaining the demurrer to the seventh cause of action for intentional infliction of emotional distress as to Bank of America, Lewis, MERS, and First American.[9]

Relying on *Bird v. Saenz* (2002) 28 Cal.4th 910 (*Bird*), the Merritts contend that "when a plaintiff witnesses a third-party victim being inflicted with harm, a cause of action exist[s] for the party who witnessed infliction." Thus, they claim that they have stated a cause of action for negligent infliction of emotional distress under the bystander theory since they "witnessed each other going through certain damage as a result of the continuous fraud over an initial 3 year period; after they tried fruitlessly to rescind their loans; loss thousands, faced financial ruin and homelessness." There is no merit to this contention.

*Bird* stated the elements of a cause of action for negligent infliction of emotional distress under a bystander theory: " 'a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, *but only if,* said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances.' [Citation.]" (*Bird*, *supra*, 28 Cal.4th at p. 915.) *Bird* held that the plaintiffs could not state a negligent infliction of emotional distress cause of action because they were not present in the operating room when their relative's artery was transected and they did not know that the care she was receiving was inadequate. (*Id.* at pp. 921-922) Here, the alleged injury occurred when the loan documents were

_____

[9]    *Kendall Yacht Corp. v. United California Bank* (1975) 50 Cal.App.3d 949 does not assist the Merritts. In *Kendall*, the defendant bank did not challenge the sufficiency of the evidence to support the award of damages for infliction of emotional distress. (*Id.* at p. 955.)

signed by the Merritts and they were unaware that it was causing injury. Accordingly, they cannot state a cause of action under this theory.

### C. Amendment to Third Amended Complaint

The Merritts argue that the trial court erred by striking the amendment to their third amended complaint. We disagree.

The trial court found that the Merritts "filed . . . a document purported to be an Amendment to the Third Amended Complaint. This document was filed without leave of court and was objected to by the moving Defendants. As such, the Court finds that it was filed improperly and strikes this filing."

Code of Civil Procedure section 472 provides in relevant part: "Any pleading may be amended once by the party of course, and without costs, at any time before the answer or demurrer is filed, or after demurrer and before the trial of the issue of law thereon, by filing the same as amended and serving a copy on the adverse party . . . ." "'[A] litigant does not have a positive right to amend his pleading after a demurrer thereto has been sustained. "His leave to amend afterward is always of grace, not of right. [Citation.]" [Citation.]' . . . After expiration of the time in which a pleading can be amended as a matter of course, the pleading can only be amended by obtaining the permission of the court. [Citations.]" (*Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 612-613.)

Here, demurrers had been filed, and thus the Merritts no longer had a right to amend as a matter of course. Instead, they were required to obtain the trial court's permission to file the amendment to the third amended complaint. Since the Merritts failed to follow the proper procedure, the trial court did not err by striking the amendment to the third amended complaint.

We next consider whether the Merritts have failed to carry their burden that they could amend their complaint to cure any defects. "To satisfy that burden on appeal, a

27

plaintiff 'must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading.' [Citation.] The assertion of an abstract right to amend does not satisfy this burden. [Citation.] The plaintiff must clearly and specifically set forth the 'applicable substantive law' [citation] and the legal basis for amendment, i.e., the elements of the cause of action and authority for it. Further, the plaintiff must set forth factual allegations that sufficiently state all required elements of that cause of action. [Citations.] Allegations must be factual and specific, not vague or conclusionary. [Citation.]" (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43-44.)

Here, the Merrits request that this court review the amendment to the third amended complaint. This amendment adds allegations primarily against the Countrywide defendants and causes of action for negligent torts. However, the Merritts have failed to state how this amendment will cure the defects in their third amended complaint. They have not set forth the applicable law and specific factual allegations that satisfy the elements of a cause of action. Accordingly, we conclude that the Merritts have failed to carry their burden on appeal.

## IV.    Disposition

The judgments in favor of First American and MERS are affirmed and the judgments in favor of Bank of America and Lewis are reversed. Costs are awarded to First American and MERS. Bank of America, Lewis, and the Merritts are to bear their own costs.

28

_____

Mihara, J.


WE CONCUR:




_____

Elia, Acting P. J.




_____

Márquez, J.




*Merritt et al. v. Mozilo et al.*
H037414